# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF MARYLAND
### (Greenbelt Division)

| | |
|---|---|
| IN RE: : | |
| MARIA DENISE REDDICK : | Case No. 24-00393-ELG |
| AKA MARIA "BEBE" REDDICK : | |
| DBA BEBE REALTY : | |
|     Debtor. : | Chapter 11, Subchapter V |

## OBJECTION TO MARIA D. REDDICKS SUBCHAPTER V
## PLAN OF REORGANIZATION

(Class 1 – Real Property: 4012 14th Street NW Washington DC 20011 – Claim 12)

COMES NOW, Deutsche Bank National Trust Company, as Trustee for Saxon Asset Securities Trust 2007-4, Mortgage Loan Asset-Backed Certificates, Series 2007-4 c/o PHH Mortgage Corporation ("Creditor") and files this objection to Maria D. Reddick's Subchapter V Plan of Reorganization (the "Plan") (ECF No. 49) filed on or about February 19, 2025 by Maria D. Reddick (the "Debtor") and respectfully states as follows:

### BACKGROUND

1. The Debtor filed for protection under Chapter 11 of the U.S. Bankruptcy Code on November 21, 2024 (the "Petition Date"). Among the assets of the Debtor is a parcel of real property in Washington D.C. having an address of 4012 14th Street NW Washington, D.C. 20011 (the "Property"). The Property had acted as the principal residence of the Debtor at some point in the past. The address of the Debtor on Petition is a commercial rental property and the rent is disclosed in the monthly operating reports. It is unclear if the Debtor will reside in the Property after confirmation. It is also unclear from the Plan if the Debtor is adding new value (as specified in 11 U.S.C. §1190).

The Debtor individually executed and delivered or is otherwise obligated with respect to that certain Adjustable Rate Note in the original principal amount of $508,500.00 (the "Note"). Creditor holds a lien on the Property by virtue of a recorded Deed of Trust (the "Deed of Trust"). The lien created by the Deed of Trust was perfected by recording of the Deed of Trust in the Recorder of Deeds for the District of Columbia on or about September 17, 2008. The Note and Deed of Trust were modified by a Home Affordable Modification Agreement, by and between the Debtor and Creditor, effective July 1, 2015 (the "Loan Modification"). The Loan Modification had a total principal balance of $748,146.33, of which $233,246.33 was deferred

1

until the maturity date of January 1, 2038. The interest bearing principal amount of $514,900.00 would be repaid in monthly installments at an interest rate of 3.375% in monthly installments. The loan was to remain escrowed for taxes and insurance.

On or about January 28, 2025, Creditor filed a Proof of Claim, Claim 12-1 (the "POC"), asserting a total secured claim against the Property of $880,619.40, with arrears due prior to the Petition Date of $272,357.26. The Debtor filed the Plan on February 19, 2025. The Plan treats Creditor as a Secured Creditor and assigns Creditor's claim as Class 1 in the Plan. Creditor has thus far abstained from taking the election under 11 U.S.C. §1111(b). The treatment of Creditor's secured claim is in Class 1 (the "Treatment") and is as follows:

> "Class 1 consists of the secured portion of the claim of PHH Mortgage Service. This class is impaired, inasmuch as the plan seeks to alter the terms upon which this debt will be paid. The Debtor will pay this obligation through irregular monthly payments during the life of this Plan, commencing on the Effective Date.
>
> [Class 2] This class consists of all allowed unsecured claims. This class shall take nothing under this Plan."

Debtor expressly recognizes that Creditor has both a Secured and Unsecured Claim against the estate, "The secured claim of [Creditor]. The unsecured portion of this creditor's claim is placed in Class 2, and this creditor is thusly regarded as holding two claims." Creditor objects to this Treatment and avers that the Plan is not confirmable. As of the date of this objection, Creditor has not but will be submitting ballots REJECTING the plan from Class 1 and Class 2, for the reasons more specifically detailed herein.

## ARGUMENT

### Unclear Treatment

2.  The Treatment for Creditor in the Plan is vague and unclear. The Plan (in the Background, Liquidation Analysis, and Means for Implementation of the Plan) describes a repayment plan to Creditor, but it is wholly unclear what the arrangement is. There is no section of the Plan that specifically states the Treatment to Creditor in Class 1 or Class 2. The Treatment is vague and ambiguous and requires Creditor to cobble together a proposed treatment from multiple sections of the Plan and its exhibits without clear explanation.

3.  Perhaps to further confuse the Treatment to Creditor, a Promissory Note is attached to the Plan, but it is not mentioned or incorporated anywhere in the Plan itself and it is unclear if the Promissory Note is meant to act as the repayment plan referenced by the Debtor to repay the

sums due to Creditor. Creditor wholly rejects the Promissory Note if it is meant to be included in the Treatment. The Plan must be amended to specifically reference the secured and unsecured treatment for Creditor.

4. The Treatment specifically states that Creditor will be repaid, "through irregular monthly payments…" This language is wholly inappropriate for a confirmable plan. There is no explanation if the payments are irregular in amount or in their timing. Such vagueness will only result in additional litigation after confirmation. Further, the wording is contradicted by the Debtor's own amortization schedule included in the exhibits. The Plan must be amended to clearly specify when, how, and how much Creditor is to be repaid on its secured and unsecured claims.

5. The Plan (in the Liquidation Analysis) states that, "For general unsecured creditors, the Debtor proposes $65,000.00 in total distribution over five years…" However, there is no specific section of the Plan addressing the treatment and repayment to Unsecured Creditors. Indeed, the only section addressing Unsecured Creditors specifically states, "This class shall take **nothing** under this Plan" (emphasis added). This flies in the face of the words in the Liquidation Analysis copied above. While the "financial projections" include payments to Class 2, beginning in month 11, there is no description of whether they are to be paid pro-rata, when they are to be disbursed, and other details to properly assess the treatment for Class 2. The Plan cannot be confirmed with such vague, contradictory, ambiguous, and unclear treatment for the affected creditors.

Insufficient Default Provisions

6. The Plan contains the following as the Default provisions in Section 8.05: "Should there occur a default under this Plan, creditors will have all rights provided for in the Bankruptcy Code (including Section 1112 thereof, inclusive of its allowances for the bringing of a motion to convert this proceeding to one under Chapter 7 of the Bankruptcy Code) as well as the right to seek recourse for breach of contract together with such remedies as this Honorable Court may deem just and proper, sitting as a court of equity; such rights will also vest in any interested parties with Article III standing to pursue such rights. A default hereunder shall be deemed to occur if the Debtor fails to make any payment provided for by this Plan, in the full amount so provided, and does not cure such failure within thirty (30) days of being given written notice of said failure by a party in interest. A default shall also be deemed to occur if the Debtor materially

violates any substantive provision of this Plan" Creditor objects to this Section in its entirety as insufficient and vague. The default provision proposed by the Debtor is wholly inadequate and does not serve the interests of judicial economy.

7. It is unclear what the process actually is when or if the Debtor is unable to meet the financial burdens of the Plan. It is unclear the amount of time to remedy default, if Court intervention is necessary, and whether the Plan strips the Creditor of Article III standing without an act of default. Creditor avers that upon confirmation of the Plan and any vesting of the estate, Creditor is granted relief from the automatic stay and the unmodified terms of the Note and Deed of Trust govern the parties, including default.

8. The Plan is not clear if, upon Confirmation or earlier, Creditor has relief from the automatic stay. The Plan is silent as to how the Creditor should proceed in light of the stay under §362 in the event the case remains open or is administratively closed and whether many of the original, unmodified terms of the Note and Deed of Trust would operate as violations of the automatic stay or discharge injunction.

9. The Promissory Note attached to the Plan also includes default provisions. These provisions are contradictory to the Plan. In the Promissory Note, an event of default occurs whe there is a default in payment under the Note. However, there is no requirement that the default be uncured for thirty (30) days like the language of the Plan. Creditor objects to the Plan because the two default provisions are incongruent. It is inequitable to bind Creditor to two different provisions should the Debtor fail to make payments to Creditor. Creditor restates that upon confirmation of a plan of reorganization, the automatic stay be terminated and the unmodified terms of the Note and Deed of Trust govern the parties.

Administrative Claim

10. Pursuant to the loan documents, the loan is currently escrowed for real estate taxes and insurance, and despite the Debtor's lack of payment, taxes and insurance continue to be advanced in regards to the Property.

11. Since the Petition Date, Creditor has advanced for real estate taxes and for insurance related to the Property. Creditor has advanced:

    a. $343.25 monthly for hazard insurance related to the Property on December 4, 2024.

    b. $3,292.52 for hazard insurance related to the Property on December 31, 2024.

    c. $2,545.56 for hazard insurance related to the Property on January 21, 2025.

    d. $2,476.32 for hazard insurance related to the Property on February 20, 2025.

    e. $3,063.11 for real estate taxes related to the Property on March 12, 2025.

    f. Creditor advances approximately $3,000.00 for real estate taxes in March and August of each year in benefit to the estate without repayment by the Debtor.

12. Creditor expressly reserves the right to amend or supplement this objection with the amount and dates of such other and further advances.

13. Creditor is entitled to repayment for those post-petition advances for taxes and insurance that have been made on behalf of the Debtor for the benefit of the estate. Without such advancements, the Property could be lost to tax sale or sustain liability that would render any reorganization with the Property meaningless. Creditor reserves its rights to file a motion for the allowance and payment of any administrative claim prior to the established bar date for such claim set in this case. There does not appear to be a Bar Date in the Plan and the Debtor should expect claims until confirmation of the Plan.

14. Further, Creditor expressly objects to the payment of administrative claims NOT placed in the appropriate class or disclosed in the Plan. The Plan states ominously, "The Plan also provides for the payment of administrative priority claims other than those placed in classes." These claims should be disclosed to Creditors, lest they affect the ability of the Debtor reorganize under the proposed provisions of the Plan.

## Interest Rate

15. The Plan purports, in the Treatment (including the Promissory Note), to pay Creditor interest at a rate of 3.375%. Creditor objects to the interest rate and the same is not confirmable. This interest rate does not include a proper risk-adjusted premium pursuant to the holding in Till v. SCS Credit Corp., 541 U.S. 465, 1224 S.Ct. 1951 (2004). The Plan proposed interest rate of 3.375% in inadequate and inequitable, "Because bankrupt debtors typically pose a greater risk of nonpayment than solvent commercial borrowers, the approach then requires a bankruptcy court to adjust the prime rate accordingly. The appropriate size of that risk adjustment depends, of course, on such factors as the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan." *Id.* The current prime rate is 7.50%. The

prime rate plus a risk adjustment premium of approximately 3.0% would be more appropriate. The Debtor meets several factors for the addition of a risk adjusted premium:

    a.    The debtor is currently involved in a bankruptcy proceeding with payments in a Chapter 11 plan that extend over a prolonged period of time (30 years). The debtor's default on the obligations of the Note and Deed of Trust was an impetus for the current proceeding.

    b.    The property is claimed to not be homestead property and an upward risk adjustment should be added because there are substantial risks given that the Plan's success depends greatly on securing paying tenants.

    c.    Debtor has a history of default related to the Property as evidenced by the POC.

    d.    Even if the Debtors' valuation and cram down of the property is successful, the loan to value ratio of the property would be 100%, which further supports an upward risk adjustment.

    e.    Rental markets are inherently more volatile than residential markets.

    f.    The income produced by the Debtor's realty business fluctuates greatly, increasing the risks associated with repayment.

    g.    The Plan proposes making capital improvements to the Property BEFORE repayment to Creditor, further justifying an upward risk assessment given the Debtor's tenuous financial condition to perform under the grossly insufficient interest rate.

<u>Feasibility</u>

16.    Creditor objects in general to overall feasibility of the Plan. The most recent monthly operating report shows a loss of $5,129.54, despite making no payments to Creditor, not paying the insurance or taxes related to the Property, nor making any of the proposed capital improvements to the Property during the administration of the case.

17.    Further, the Debtor proposes a below *Till* interest rate in repayment to the Creditor in the Plan, yet also delays beginning repayment to Creditor for nearly a year after the Effective Date. This type of financial arrangement is not only dubious, but clearly shows that the reorganization is predicated on the Debtor not paying creditors under the Plan while still attempting to rehabilitate the assets of the estate. This is a plain admission of the Debtor that the Property is administratively burdensome and should be surrendered.

18.    In the context of a Chapter 11, generally, under 11 U.S.C. §1129(a)(11), the Court is required to find that "confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor...." The widely accepted application of this section as stated within the Second Circuit decision of *Chase Manhattan Mortgage and Realty Trust v.*

*Bergman (In re Bergman)*, 585 F.2d, 1171, 1179 (2nd Cir. 1978), wherein the Court stated: 'Under the test of feasibility, the court used the probability of actual performance of the provisions of the plan. Sincerity, honest, and willingness are not sufficient to make a plan feasible, and neither are visionary promises. The test is whether the things which are to be done after confirmation can be done as a practical matter under the facts.' In the context of a Subchapter V Chapter 11 Plan, this notion has been firmed up with express statutory requirements related to feasibility. Specifically, 11 U.S.C. § 1191(c) requires that the debtor will be able to make all payments under the Plan, or that there is a reasonable likelihood that debtor will be able to make all payments under the Plan. See, 11 U.S.C. § 1191(c)(3)(A)(i) and (A)(ii). Generally speaking, this requires the Debtor to be able to pay administrative claims on the Effective Date, and make the ongoing payments and expenses required under the Plan. Retaining property that is not producing net income is evidence of bad faith and such a plan should not be confirmed. *See In re Lindsey*, 122 B.R. 157 (Bankr. M.D. Fla. 1991) ("[T]he court may not and should not permit the debtors to use a [plan] to retain and increase their equity in investment property at the expense of their unsecured creditors."); see also *Loop Corp. v. United States Trustee*, 379 F.3d 511, 515-16 (8th Cir. 2004) (properties must generate positive cash flow to justify retention; negative cash flow alone is cause to dismiss or convert under § 1112(b)).

19. The Monthly Operating Reports of the Debtor clearly demonstrate the inability of the Debtor to successfully collect rents (either from the Property or the office lease listed on the Petition). The Reports show that the $1,100.00 monthly rent from the tenant in the Property has yet to be collected post-petition. Without rental income, the Property will simply not be cash positive to support its debt obligation under the Plan, even after the delay for capital improvements and the below market interest rate. The Debtor's inability to collect rents from the Property or evict/eject non-paying tenants from the Property is evidence that the Debtor is not acting in good faith and employing commercially reasonable methods to repay both secured and unsecured creditors. If the Debtor is unable to collect rents from its current tenants, why should creditors believe that the Debtor will be successful with additional, new tenants?

20. The success of the Plan requires optimistic projections of the Debtor, retention of funds without paying Creditors, below market and *Till* rates of interest, repayment over extended

period of time, unexplained payments to an unsecured class of creditors, and new tenants to lease portions of the Property. All of these factors together, combined with the track record of the Debtor, show that the Plan is simply not feasible as proposed. The Plan will result in immediate default when payments due to the creditors actually begin and the Debtor will abscond with the equity to the determinant of creditors secured and unsecured.

Conclusion

In conclusion, the Debtor cannot afford the plan of reorganization they propose. Even if the Creditor relented and allowed the Plan to move to confirmation, it would fail to meet the requirement of 11 U.S.C. §1129(A)(11), because the debtor would be forced to further reorganize or liquidate the undersecured Property.

WHEREFORE, with the above considered, Creditor respectfully requests that this Court:

A) SUSTAIN the Creditor's Objection to the Plan,

B) DENY Confirmation of the Debtor's Plan,

C) DISMISS the instant case because there is no need for further financial reorganization or the Plan is likely to be followed by a liquidation, or

D) CONVERT the case to a proceeding under Chapter 7 of the U.S. Bankruptcy Code; and

E) Such other and further relief as justice may require.

Dated: April 11, 2025                    Respectfully submitted,

_____/s/ _Gregory C. Mullen__
Gregory C. Mullen, Bar No. 29635
BWW Law Group, LLC
6003 Executive Blvd, Suite 101
Rockville, MD 20852
301-961-6555 (p), 301-961-6545 (f)
bankruptcy@bww-law.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 11th day of April, 2025, a copy of foregoing was served electronically via the CM/ECF system or by first-class mail, postage prepaid:

Maria Denise Reddick
3910 Georgia Ave NW
#619
Washington, DC 20011

Maurice Belmont VerStandig
9812 Falls Road
#114-160
Potomac, MD 20854

Kristen S. Eustis
Office of the United States Trustee
1725 Duke Street, Ste 650
Alexandria, VA 22314

Christianna Annette Cathcart
The Dakota Bankruptcy Firm
1630 First Ave N
Ste B PMB 24
Fargo, ND 58102-4246

Monique Desiree Almy
Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004

                                              ___*/s/ Gregory Mullen*_____
                                              Gregory C. Mullen