IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re: | ) | Case No. 24-00393 |
| | ) | (Chapter 11) |
| MARIA D. REDDICK | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |

**MARIA D. REDDICK'S
<u>SUBCHAPTER V PLAN OF REORGANIZATION</u>**

  Comes now Maria D. Reddick ("Ms. Reddick" or the "Debtor"), by and through undersigned counsel, pursuant to the rigors of Official Form 425A, and provides the following plan of reorganization (the "Plan") herein:

**Background for Cases Filed Under Subchapter V**

 a. **Description and History of the Debtor's Business**

  Resilience often comes to light in the face of life's hardest trials, and a few embody this more fully than Ms. Reddick, whose determination spans multiple professional realms. She serves as a program specialist with the District of Columbia's Department of Building, holds a real estate commission license, works seasonally with Delta Airlines when able, and has formed several single-member LLCs to manage her real estate ventures. Beyond her vocational roles, she has an unwavering commitment to both community and family.

  Yet, even the most resourceful among us can find themselves navigating financial headwinds. In Ms. Reddick's case, her current financial reorganization is a deliberate effort aimed at recalibration. At the heart of this case lies her investment property – what she has long regarded as her "true home." This property represents more than bricks and mortar; it symbolizes the vision and initiative that underlie her entrepreneurial endeavors. When mortgage payments fell behind, exacerbated by a tenant struggling with rent and an unoccupied suite, she chose empathy over eviction, a response that mirrors her broader ethos in both business and personal matters.

  Ms. Reddick now seeks to formally reorganize through the provisions of this Plan. As an intelligent and accomplished professional, Ms. Reddick has long exemplified a commitment to excellence across multiple roles. She is precisely the kind of debtor envisioned by Subchapter V of Chapter 11 of Title 11 of the United States Code—someone who, though facing temporary financial obstacles, has a clear path to restructuring and future financial success.

  This case was thusly filed on November 21, 2024 with the open and transparent aim of using tools uniquely available under Title 11 of the United States Code (the "Bankruptcy Code") to preserve her "true home" through planned renovations, reoccupying the vacant suite, and restructuring her mortgage obligations. Equally, Ms. Reddick intends to secure sufficient income for a fair distribution to creditors under this Plan. Guided by resourcefulness, empathy, and a steadfast dedication to her obligations, Ms. Reddick's primary objective is not merely to prevent

foreclosure but to safeguard the foundation she has built for her future and the well-being of those who rely on her.

### b. Liquidation Analysis & Secured Claim Valuation

To confirm the Plan, the Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such claim and equity interest holders would receive in a Chapter 7 liquidation. The Debtor initially entered bankruptcy with assets totaling $1,034,864.67. From that figure, $610,000.00 represent secured claims, $166,320.00 reflects non-debtor equity, and $21,986.99 comprises exemptions. In a purely mechanical calculation, those deductions would leave $196,557.68 in nonexempt property for liquidation. Subtracting $13,077.88 in estimated Chapter 7 administrative expenses from that nonexempt amount suggests $183,479.80 would be available to pay general unsecured creditors. Compared to the total unsecured debt of $380,957.96, this simplistic approach points to a dividend of roughly 48.16% under a hypothetical Chapter 7.

The Debtor contends, however, that a Chapter 7 liquidation would produce significantly less than this "arithmetic" calculation implies. After carefully evaluating each asset's realistic liquidation potential and administrative costs, the Debtor proposes the following adjustments: retaining the Navy Federal Credit Union balance of $18,208.18 at full value; (ii) treating the tax refund of $17,011.00 and $8,161.00 as fully collectible; (iii) discounting the $14,000.00 interest in BeBe Realty Sales and Consulting by 90% to $1,400.00 given that its value depends heavily on the Debtor's personal expertise; (iv) discounting the $2,975.00 interest in Luka Holdings by 90% to $297.50, for the same reason; (v) discounting $112,825.50 in unpaid rent by 90% to $11,282.50, to reflect the practical barriers in collecting from tenants; (vi) discounting the $22,680.00 interest in an unprobated estate by 75%, leaving a value of $5,670.00; and (vii) discounting the $697.50 Residential One Deposit by 50%, to $348.75. After factoring in $6,368.95 for Chapter 7 administrative expenses, the Debtor calculates that the actual nonexempt property would be $56,010.03, resulting in a scant 14.7% return to general unsecured creditors.

Meanwhile, the Debtor's Plan proposes a more structured approach to asset management and debt repayment. Notably, the Plan acknowledges the fully secured $610,000.00 claim and provides for its repayment under restructured terms. For general unsecured creditors, the Debtor proposes $100,185.00 in total distributions over five years – an amount that is likely to exceed what would be realized in a Chapter 7 "fire sale." By avoiding rushed asset liquidation and preserving the Debtor's ability to collect on receivables and business interests, the Plan is designed to maximize overall creditor recovery. Creditors will therefore receive at least as much under this methodical Chapter 11 approach as they would be in a Chapter 7 liquidation, and more likely, since the Plan endeavors to protect and enhance the values that would be lost or heavily discounted in a forced liquidation scenario.

### c. Ability to Make Future Plan Payments and Operate Without Further Reorganization

The Debtor must also show that it will have enough cash over the life of the Plan to make the required Plan payments. Forward looking financial projections for the Debtor are attached herein as **Exhibit A.** These figures show that the Debtor will have projected disposable income (as defined in § 1191(d) of the Bankruptcy Code), remain

2

Notwithstanding the Debtor's confidence in these projections, real estate and related ventures can be subject to external economic pressures such as fluctuating property values, shifts in tenant demand, and unforeseen repair or renovation costs. While the Debtor has used the best available data to forecast post-renovation occupancy and anticipated rents, the Debtor acknowledges that no projection is a guarantee of future performance. If material setbacks arise – such as unexpected vacancies, an unanticipated jump in costs, or substantial changes in market conditions – the Debtor will endeavor to mitigate these risks promptly, including potential modifications within the bounds of the Bankruptcy Code and any applicable plan provisions.

Despite such uncertainties, the Debtor believes that the realistic revenue assumptions, combined with prudent cost management and a clear plan for rent collection, will yield sufficient disposable income to cover all projected Plan distributions. The Debtor has established contingency measures, such as maintaining a reserve for unexpected expenses and setting flexible lease terms, to further ensure ongoing feasibility. In the Debtor's view, these strategies best position both the Debtor and creditors to benefit from a successful reorganization and reduce the likelihood of any subsequent bankruptcy filing.

**You should consult with your accountant or other financial advisor if you have any questions pertaining to these projections.**

**Article 1.    Summary**

This Plan under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") proposes to pay creditors of the Debtor from the general cash flow of the Debtor.

The Plan provides for:    1 class of secured claim; and

1 class of non-priority, unsecured claims.

The Plan also provides for the payment of administrative priority claims other than those placed in classes.

**Your rights may be affected. You should read these papers carefully and discuss them with your attorney, if you have one. (If you do not have an attorney, you may wish to consult one.)**

**Article 2.    Classification of Claims and Interests**

| | | |
|---|---|---|
| **Section 2.01** | **Class 1** | The secured claim of PHH Mortgage Service. The unsecured portion of this creditor's claim is placed in Class 2, and this creditor is thusly regarded as holding two claims. |
| **Section 2.02** | **Class 2** | All general unsecured claims. |

**Article 3.    Treatment of Administrative Expense Claims and Court Costs**

| | | |
|---|---|---|
| **Section 3.01** | **Unclassified Claims** | Under § 1123(a)(1) of the Bankruptcy Code, certain administrative expense claims are not in classes. |
| **Section 3.02** | **Administrative Expense Claims** | Pursuant to Section 503 of the Bankruptcy Code, each holder of an allowed administrative claims will be paid in full on the Effective Date of this Plan, in cash, or upon such other terms as may be agreed upon by the holder of the claim and the Debtor. All professionals including the Debtor's counsel and the Subchapter V Trustee will need to file applications with the Court to seek approval of their fee and expenses as allowed administrative expense claims within 30 days of the Effective Date. Any allowed administrative expense claim will be paid through the life of this Plan, per the allowances of Section 1191(e) of the Bankruptcy Code. Allowed administration claims will be paid first from funds otherwise payable to Class 2. |
| **Section 3.03** | **Priority Tax Claims** | Each holder of a priority tax claim will be paid in full not later than December 21, 2029. It is not, however, believed any such claims exist. |
| **Section 3.04** | **Statutory Fees** | There are no statutory fees due in this case. |
| **Section 3.05** | **Prospective Quarterly Fees** | There are no prospective quarterly fees that will be due in this case. |

**Article 4.    Treatment of Claims and Interest Under the Plan**

| Class | Impairment | Treatment |
|---|---|---|
| Class 1 – PHH Mortgage Service | Impaired | Class 1 consists of the secured portion of the claim of PHH Mortgage Service. This class is impaired, inasmuch as the plan seeks to alter the terms upon which this debt will be paid. The Debtor will pay this obligation through irregular monthly payments during the life of this Plan, commencing on the Effective Date. |
| Class 2 – General unsecured creditors | Impaired | This class consists of all allowed unsecured claims. After payment of the |

4

sole secured creditor in accordance with the Plan, this class shall receive the remaining funds, with an estimated distribution of approximately $100,185.00. All allowed administrative claims will be paid first. If no funds remain after payment of the secured claim and administrative expenses, no distribution shall be made to this class.

**Article 5.    Allowance and Disallowance of Claims**

**Section 5.01    Disputed Claim.** A *disputed claim* is a claim that has not been allowed or disallowed and as to which either: (i) a proof of claim has been filed or deemed filed, and the Debtor or another party in interest has filed an objection; or (ii) no proof of claim has been filed, and the Debtor has scheduled such claim as disputed, contingent, or unliquidated.

**Section 5.02    Delay of Distribution of Disputed Claims.** No distribution will be made on account of a disputed claim unless such claim is allowed by a final, non-appealable order.

**Section 5.03    Settlement of Disputed Claims.** The Debtor will have the power and authority to settle and compromise a disputed claim with court approval and compliance with Rule 9019 of the Federal Rules of Bankruptcy Procedure.

**Section 5.04    Time to Dispute Claims**. The Debtor does not presently anticipate objecting to any claims herein, but reserves the right to do so. Any such claim objection must be filed by the Debtor within one hundred eighty (180) days from the Effective Date of this Plan (as defined in Section 8.02 herein), *except* any objection to the claim of any governmental tax creditor may be filed at any time within six months of the date on which such claim is filed.

**Article 6.    Provisions for Executory Contracts and Unexpired Leases**

**Section 6.01    Assumption.** The Debtor assumes the executory contracts and unexpired leases with (i) Luka Holdings LLC; (ii) Residential One d/b/a 3 Tree Flats; and (iii) Peter Fleck. The Debtor also assumes all executory contracts and unexpired leases for the provision of utility services to any building occupied by the Debtor and the provision of insurance to the Debtor.[1]

**Section 6.02    Cure Payments.** Consistent with the provisions of Article 4 hereof, the Debtor will not make complete cure payments, to the counterparties of assumed contracts and unexpired leases, on the Effective Date. The Debtor will, rather, make such payments in equal installments over a period of one year, commencing on the first business day of the first month succeeding the Effective Date. For purposes of Section 365(b)(1)(A) of Title 11 of the United States Bankruptcy

---

[1] The Debtor anticipates that the executory contract with Residential one d/b/a 3 Tree Flats will be addressed and disposed of pursuant to a soon-to-be-filed motion under Bankruptcy Rule 9019.

Code (the "Bankruptcy Code"), the Debtor submits that the temporally prioritized payment of these arrearages under this Plan, coupled with the Debtor's healthy post-position financial performance and timely making of post-petition rent payments, constitutes "adequate assurance" of the cure payments being made. The Debtor equally submits that in the prism of this case, a one year cure period is "prompt" in nature. Upon diligent inquiry, however, it does not appear any cure payments are due and owing.

**Section 6.03   Rejection.** The Debtor rejects all executory contracts and unexpired leases not assumed in Section 6.01 hereof.

**Article 7.         Means for Implementation of the Plan**

The Debtor will continue to be employed as a Program Specialist with the District of Columbia's Department of Building, providing a consistent base income, and also work seasonally for Delta when her health permits. While recent injuries have prevented participation from seasonal work, the Debtor remains confident that once recovered, this avenue may again bolster her overall revenue.

Because the subjected real property is not the Debtor's principal residence, the Debtor proposes to rewrite the existing mortgage as a ten-year obligation amortized over thirty-years, culminating in a balloon payment at the end of the ten-year term. The Debtor reserves the right, upon maturity of the term, to satisfy the ballon payment using any commercially reasonable method she deems appropriate, including but not limited to refinancing or other strategic financial alternative. Within the first three months following the Effective Date, the Debtor intends to deploy funds obtained from a wholly owned limited liability company, whether by loan or member distribution, to facilitate necessary renovations to the main floor of the property. The renovations will be completed by the current tenant occupying the basement suite of this property who currently is deficient on rent. The value of the tenant's construction services will be credited toward reducing their rent arrears and will concurrently lower the overall renovation costs. The Debtor shall use commercially reasonable efforts to complete these improvements set forth in this Plan, so as to align with Plan confirmation and the anticipated commencement of rental revenue.

All net operating income derived from the property, after deducting taxes, insurance, utilities, and other regular expenses, will be applied toward Plan obligation. Should a shortfall arise in the early phases, the Debtor may draw upon her salary, or any additional resources from the LLC. Further, the Debtor reserves all rights to pursue back rent or damages from subtenants who have failed to meet their obligations, with any recovery to be deposited into a dedicated account for distribution in accordance with the Plan's classification and priority scheme.

**Article 8.         General Provisions**

**Section 8.01   Definitions and Rules of Construction.** The definitions and rules of construction set forth in §§ 101-02 of the Bankruptcy Code shall apply when terms defined or construed in the Bankruptcy Code are used in this Plan.

**Section 8.02   Effective Date.** The effective date of this Plan is the first business day following the date that is 14 days after the entry of the confirmation order. If, however, a stay of the

confirmation order is in effect on that date, the effective date will be the first business day after the date on which the stay expires or is otherwise terminated.

**Section 8.03    Severability.** If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

**Section 8.04    Binding Effect.** The rights and obligations of any entity named or referred to in this Plan will be binding upon, and will inure to the benefit of, the successors, assigns and/or receiver(s) of such entity.

**Section 8.05    Default.** Should there occur a default under this Plan, creditors will have all rights provided for in the Bankruptcy Code (including Section 1112 thereof, inclusive of its allowances for the bringing of a motion to convert this proceeding to one under Chapter 7 of the Bankruptcy Code) as well as the right to seek recourse for breach of contract together with such remedies as this Honorable Court may deem just and proper, sitting as a court of equity; such rights will also vest in any interested parties with Article III standing to pursue such rights. A default hereunder shall be deemed to occur if the Debtor fails to make any payment provided for by this Plan, in the full amount so provided, and does not cure such failure within thirty (30) days of being given written notice of said failure by a party in interest. A default shall also be deemed to occur if the Debtor materially violates any substantive provision of this Plan.

**Section 8.06    Disbursing Agent.** There shall be no disbursing agent hereunder and the Debtor will make all payments to creditors directly, by check or, where available, direct deposit or auto-debit.

**Section 8.07    Captions.** The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

**Section 8.08    Controlling Effect.** Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure), the laws of North Dakota govern this Plan and any agreements, documents, and instruments executed in connection with this Plan, except as otherwise provided in this Plan.

**Section 8.09    Escheat.** If any distribution remains unclaimed for a period of 90 days after it has been delivered (or attempted to be delivered) in accordance with the Plan to the holder entitled thereto, such unclaimed property shall be forfeited by such holder. Unclaimed property shall be (i) first paid to other members of the class of the claimant not claiming said distribution, until such a time as said class is paid in full; (ii) second paid to each junior class, until all classes are paid in full; and (iii) then, if and when each class is paid in full, remaining funds shall be donated in equal parts to Howard University Law Clinic and Capital Temple Ministries. These organizations shall administer such funds in a charitable manner consistent with their mission and objectives.

**Section 8.10    Retention of Jurisdiction.** The United States Bankruptcy Court for the District of Columbia shall retain jurisdiction of this Chapter 11 case to issue orders necessary to the consummation of the Plan; to determine the allowance of compensation and expenses of professionals; to determine any and all adversary proceedings, applications and contested matters; to determine issues or disputes relating to the assumption of executory contracts and any claims

related thereto; to determine disputes as to classification or allowance of claims or interests; to issue such orders in aid of execution of this Plan to the extent authorized by § 1142 of the Bankruptcy Code; to enforce the provisions of the Plan; to recover all assets of the Debtor and property of the Debtor's estate, wherever located; to resolve any dispute between or among any of the parties to this bankruptcy proceeding, to determine other such matters as may be set forth in a confirmation order or as may be authorized under the provisions of the Bankruptcy Code; to enter a final decree closing the bankruptcy case; and to correct any defect, cure any omission or reconcile any inconsistency in this Plan or confirmation order, and to take any action or make any ruling as may be necessary to carry out the purpose and intent of this Plan.

**Section 8.11   Modifications.** The Debtor may, with the approval of the Bankruptcy Court and without notice of holders of claims, correct any nonmaterial defect, omission, or inconsistency herein in such a manner and to such extent as may be necessary or desirable. The Debtor may also amend this Plan in any manner that renders the terms hereof more favorable to creditors, with the approval of the Bankruptcy Court and without notice to holders of claims.

**Section 8.12   Professional Fees.** Per Section 3.02 of this Plan, the Debtor must seek the approval of this Honorable Court prior to paying any professional fees incurred during the pendency of this case. Commencing on the Effective Date, however, the Debtor shall be free to pay any post-confirmation fees incurred by the Subchapter V trustee, counsel, or other professionals, without first obtaining leave of court, and such professionals shall thereafter be excused from any requirement to seek leave of court.

**Article 9.      Discharge**

**Section 9.01   Discharge.** The Court shall grant the Debtor a discharge pursuant to 11 U.S.C. § 1192 of all debts that arose prior to the Petition Date in this case, except any debt (1) on which the last payment is due after the first five (5) years of the Plan; and (2) debts of the kind specified in Section 523(a) of the Bankruptcy Code.

(a) If the Plan is confirmed under 11 U.S.C. § 1191 as a consensual plan, the Debtor shall receive a discharge on the Effective Date of the Plan; or

(b) If the Plan is confirmed under 11 U.S.C. § 1191(b), the Bankruptcy Court shall grant a discharge upon the completion of the plan payments being made in June 2029.

**Section 9.02   Effect of Discharge.** This discharge will be effective against all creditors of the Debtor given notice of this bankruptcy case and sent a copy of this Plan, together with their respective members, managers, insiders, shareholders, officers, directors, trustees and receivers.

**Article 10.    Retention of Certain Assets; Notice of Substantial Consummation**

**Section 10.01** Pursuant to Section 1123(b)(3)(B) of the Bankruptcy Code, all litigation claims (including, but not limited to, rights arising under Chapter 5 of the Bankruptcy Code) shall remain an asset of the Debtor's bankruptcy estate—and shall, accordingly, remain subject to the protections of Section 362(c)(1) of the Bankruptcy Code—to and through December 7, 2029, at which time said interest (should any remain) shall revest in the Debtor.

**Section 10.02** If the Plan is confirmed under 11 U.S.C. § 1191(a), the Debtor will file a Notice of Substantial Consummation not later than 14 days after the Plan is substantially consummated per 11 U.S.C. § 1183(c)(2).

    Respectfully Submitted,

    /s/ Christianna A. Cathcart
    Christianna A. Cathcart, Esq.
    Bar No.: ND10095
    THE BELMONT FIRM
    1050 Connecticut Avenue NW
    Suite 500
    Washington, DC 20036
    christianna@dcbankruptcy.com
    *Counsel for the Debtor*