IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Greenbelt Division)

| | |
|---|---|
| IN RE: | : |
| MARIA DENISE REDDICK | : Case No. 24-00393-ELG |
| AKA MARIA "BEBE" REDDICK | : |
| DBA BEBE REALTY | : |
| Debtor. | : Chapter 11, Subchapter V |

**OBJECTION TO MARIA D. REDDICKS THIRD AMENDED SUBCHAPTER V PLAN OF REORGANIZATION**

(Class 1 – Real Property: 4012 14th Street NW Washington DC 20011 – Claim 12)
(Class 3 – Unsecured Claim of approximately $270,619.40)

COMES NOW, Deutsche Bank National Trust Company, as Trustee for Saxon Asset Securities Trust 2007-4, Mortgage Loan Asset-Backed Certificates, Series 2007-4 c/o PHH Mortgage Corporation ("Creditor") and files this objection to Maria D. Reddick's Third Amended Subchapter V Plan of Reorganization (the "Third Plan") (ECF No. 86) filed on or about June 25, 2025, by Maria D. Reddick (the "Debtor") and respectfully objects as follows:

**BACKGROUND**

1.      The Debtor filed for protection under Chapter 11 of the U.S. Bankruptcy Code on November 21, 2024 (the "Petition Date"). Among the assets of the Debtor is a parcel of real property, having an address of 4012 14th Street NW Washington, D.C. 20011 (the "Property"). The Property had acted as the principal residence of the Debtor at some point prior to the Petition Date. The address of the Debtor on Petition is a commercial rental property and the rent is disclosed in the monthly operating reports. It is unclear if the Debtor will reside in the Property post-confirmation. She refers to the Property as her "true home," (Third Plan, p. 1) despite not listing the Property as her principal residence in the Schedules. It is also unclear from the Plan if the Debtor is adding new value (as specified in 11 U.S.C. §1190).

2.      The Debtor individually executed and delivered or is otherwise obligated with respect to that certain Adjustable Rate Note in the original principal amount of $508,500.00 (the "Note"). Creditor holds a lien on the Property by virtue of a recorded Deed of Trust (the "Deed of Trust"). The lien created by the Deed of Trust was perfected by recording of the Deed of Trust in the Recorder of Deeds for the District of Columbia on or about September 17, 2008. The Note and Deed of Trust were modified by a Home Affordable Modification Agreement, by and between

1

the Debtor and Creditor, effective July 1, 2015 (the "Loan Modification"). The Loan Modification had a total principal balance of $748,146.33, of which $233,246.33 was deferred until the maturity date of January 1, 2038. The interest bearing principal amount of $514,900.00 would be repaid in monthly installments at an interest rate of 3.375% in monthly installments. The loan was to remain escrowed for taxes and insurance.

3. On or about January 28, 2025, Creditor filed a Proof of Claim, Claim 12-1 (the "POC"), asserting a total secured claim against the Property of $880,619.40, with arrears due prior to the Petition Date of $272,357.26.

4. The Debtor filed a plan on February 19, 2025 (the "First Plan"). In the First Plan (as is the case with the Third Plan), the Debtor expressly recognized that Creditor had both a Secured and Unsecured Claim against the estate, "The secured claim of [Creditor]. The unsecured portion of this creditor's claim is placed in Class 2, and this creditor is thusly regarded as holding two claims" (First Plan, p. 3). Creditor objected to the First Plan and Creditor's treatment in that plan on April 11, 2025 (the "Original Objection") (ECF No. 65).

5. After the Original Objection was filed, the Debtor filed a Second Amended Subchapter V Plan of Reorganization (the "Second Plan") (ECF No. 85) on June 24, 2025. The day after the Second Amended plan was filed, on June 25, 2025, the Third Plan was filed.

6. The Third Plan treats Creditor's Secured Claim against the Property in Class 1. The treatment of Class 1 in the Third Plan is as follows:

> "Class 1 consists of the secured portion of the claim of PHH Mortgage Service. This class is impaired, inasmuch as the plan seeks to alter the terms upon which this debt will be paid. The Debtor will pay this obligation through irregular monthly payments during the life of this Plan, commencing on the Effective Date.

The Third Plan treats the Unsecured Claim of Creditor in Class 3. The treatment of Class 3 in the Third Plan is as follows:

> "This class consists of all allowed unsecured claims. After payment of the sole [sic] secured creditor in accordance with the Plan, this class shall receive the remaining funds, with an estimated $100,185.00. All allowed administrative claims will be paid first out of funds otherwise designated for the payment of this class. If no funds remain after payment of the secured claim and administrative expenses, no distribution shall be made to this class."

**7.** Creditor has thus far abstained from taking the election under 11 U.S.C. §1111(b). Creditor objects to its treatment in Class 1 and in Class 3. As of the date of this objection, Creditor has submitted ballots REJECTING the Plan from both classes to counsel for the Debtor.

## **ARGUMENT**

8.  First, as the plan treatment is substantially similar in the Third Plan as in the Debtor's First Plan, Creditor incorporates by reference, and adopts fully, its filed objection to the Subchapter V Plan of Reorganization (the "Original Objection") (ECF No. 65) as if fully stated herein.

<u>Unclear Treatment</u>

9.  The Treatment for Creditor in the Third Plan is still vague and unclear. Despite the Original Objection, the Debtor refuses to succinctly state a treatment for Creditor that is discernible and concrete. The very language employed by the Debtor in the description of claim treatment, namely "irregular monthly payments," calls into question the good faith nature of the Third Plan. Indeed, many factors in determining the good faith nature of the Third Plan are at play in Creditor's treatment and "these factors might include, depending on the particular case, not only the percentage of proposed repayment, but also the debtor's financial situation, the period of time payment will be made, the debtor's employment history and prospects, the nature and amount of unsecured claims, the debtor's past bankruptcy filings, the debtor's honesty in representing facts, and any unusual or exceptional problems facing the particular debtor." *Deans v. O'Donnell*, 692 F.2d 968, 972 (4th Cir. 1982).

10. The Third Plan (in the Background, Projections, Amortization Schedule, Liquidation Analysis, and Means for Implementation of the Plan) loosely describes a repayment plan to Creditor, but it is wholly unclear what the arrangement actually is. There is no section of the Plan that specifically states the entire treatment or payment schedule to Creditor for its secured claim in Class 1. The Treatment is vague and ambiguous and requires Creditor to cobble together a proposed treatment from multiple sections of the Plan and its exhibits. This is done to hide the fact that the Debtor is using the secured creditor to subsidize the Debtor's entire reorganization. Creditor suspects that if the Debtor had to actually print the words, "[Creditor] will not receive any payments on its secured claim for one (1) year following the Effective Date of the Plan" that it might become evident just unfeasible the Third Plan is and how far afoul the treatment of Creditor runs from the requirements 11 U.S.C. §1191(c)(3)(B), because it removes all the remedies of Creditor while no payments on its claims are made.

11.     As if the foregoing were not evidence enough of the unclear treatment of Creditor, there is no specific mention of any of a resolution of the considerable debt remaining to Creditor after the five (5) year projections. The Projections show five (5) years of payments (four, after deducting the year without payments to Creditor). The Amortization Schedule shows ten (10) years of proposed payments to Creditor. Notably, the end of the Amortization Schedule shows $508,402.52 remaining on the proposed, valued treatment of Creditor's secured claim. There is no reference for any payment of this amount. A creditor would need to look beyond its treatment, and the treatment of other claims, to the Debtor's "Means for Implementation of the Plan" to see that a balloon payment is contemplated. Of course, there is no explanation on how the Debtor will make the balloon payment, why the balloon payment is in the best interest of the Creditors, the deadline to make such a large balloon payment, or even an estimation of the balloon payment amount. Creditor's treatment is confusing, clearly unfinished, and impermissible. Confirming such a plan would not only fail to pass the Chapter 7 liquidation test, but also not be in the interest of judicial economy, because the vague treatment would necessitate constant court intervention for the Creditor to accurate protect their rights against the Property.

12.     The Debtor does not account for the failure to make any payments on the Creditor's secured claim for a year in the Liquidation Analysis provided with the Third Plan. No adequate protection, adjustment, or payment is contemplated by the Debtor's refusal to make any payment on either secured claim or the unsecured claims in the Third Plan. Even with the Debtor valuing the secured claim, the Debtor cannot offer a cohesive repayment plan. Requiring a Creditor to not accept payments as of the Effective Date as to both its secured and unsecured claims fails the Chapter 7 liquidation test outright.

13.     Additionally, the Third Plan is facially deficient in regards to the Unsecured Creditors. In one section of the Third Plan, they are to share in "an estimated $100,185.00" pot of funds. This fund is not shown anywhere in the Third Plan. Indeed, the ending balance of the Debtor's projections after five years has a mere $39,866.07 available to possibly distribute. The Third Plan does not even include Class 3 in the projections. The Class 3 treatment (perhaps a typo) references only one secured creditor despite the fact that there are two secured creditors in this case. In the Third Plan, the second secured creditor (Navy Federal Credit Union) is being paid pursuant to its contract. By the plain language of the Third Plan, unsecured creditors may not be

paid at all until Navy Federal Creditor Union is paid in full. If this is not the intent of the Debtor, the Third Plan must be amended and not confirmed.

14. Further still, the unsecured claimants are denied any explanation of the means of establishing the $100,185.00 in funds to pay claimants, whether they are to be paid pro-rata, and other details to properly assess the treatment for Class 3. The Plan cannot be confirmed with such vague, contradictory, ambiguous, and unclear treatment for the affected creditors – especially when requiring both secured and unsecured creditors to go prolonged periods post-confirmation without any payments being made.

Insufficient Default Provisions

15. The Third Plan contains the following as the Default provisions in Section 8.05:

> "Should there occur a default under this Plan, creditors will have all rights provided for in the Bankruptcy Code (including Section 1112 thereof, inclusive of its allowances for the bringing of a motion to convert this proceeding to one under Chapter 7 of the Bankruptcy Code) as well as the right to seek recourse for breach of contract together with such remedies as this Honorable Court may deem just and proper, sitting as a court of equity; such rights will also vest in any interested parties with Article III standing to pursue such rights. A default hereunder shall be deemed to occur if the Debtor fails to make any payment provided for by this Plan, in the full amount so provided, and does not cure such failure within thirty (30) days of being given written notice of said failure by a party in interest. A default shall also be deemed to occur if the Debtor materially violates any substantive provision of this Plan"

Creditor objects to this Section in its entirety as insufficient and vague. The default provision proposed by the Debtor is wholly inadequate and does not serve the interests of judicial economy.

16. It is unclear what the process actually is when or if the Debtor is unable to meet the financial burdens of the Third Plan. It is unclear the amount of time to remedy default, if Court intervention is necessary, and whether the Third Plan strips the Creditor of Article III standing without an act of default. Creditor avers that upon confirmation of the Plan and any vesting of the estate, Creditor is granted relief from the automatic stay, and the unmodified terms of the Note and Deed of Trust govern the parties, including default and acceleration.

17. The Third Plan is not clear if, upon Confirmation or earlier, Creditor has relief from the automatic stay. The Third Plan is silent as to how the Creditor should proceed in light of the stay under §362 in the event the case remains open or is administratively closed and whether many of the original, unmodified terms of the Note and Deed of Trust would operate as violations of the automatic stay or discharge injunction.

Administrative Claim

18. Pursuant to the loan documents, the loan is currently escrowed for real estate taxes and insurance, and despite the Debtor's lack of payment, taxes and insurance continue to be advanced in regards to the Property.

19. Since the Petition Date, Creditor has advanced for real estate taxes and for insurance related to the Property. Creditor has thus far advanced:

  a. $343.25 monthly for hazard insurance related to the Property on December 4, 2024.
  b. $3,292.52 for hazard insurance related to the Property on December 31, 2024 (which resulted in a $67.75 refund in January 2025).
  c. $2,545.56 for hazard insurance related to the Property on January 21, 2025.
  d. $2,476.32 for hazard insurance related to the Property on February 20, 2025.
  e. $3,063.11 for real estate taxes related to the Property on March 12, 2025.
  f. $2,142.00 for hazard insurance related to the Property on May 21, 2025.
  g. Creditor anticipates advancing approximately $3,000.00 for real estate taxes in August 2025, in benefit to the estate without repayment by the Debtor.

20. Creditor expressly reserves the right to amend or supplement this objection with the amount and dates of such other and further advances, in addition to the nearly $16,000 in advances made since the Petition Date described above.

21. Creditor is entitled to repayment for those post-petition advances for taxes and insurance that have been made on behalf of the Debtor for the benefit of the estate. Without such advancements, the Property could be lost to tax sale or sustain liability that would render any reorganization with the Property meaningless. Creditor reserves its rights to file a motion for the allowance and payment of any administrative claim prior to the established bar date for such claim set in this case. There does not appear to be a Bar Date in the Plan and the Debtor should expect claims until confirmation of the Plan.

22. Further, Creditor expressly objects to the payment of administrative claims NOT placed in the appropriate class or disclosed in the Third Plan. The Third Plan (p. 3) states ominously, "The Plan also provides for the payment of administrative priority claims other than those placed in classes." These claims should be disclosed to Creditors, lest they affect the ability of the

Debtor reorganize under the proposed provisions of the Plan. Gerrymandering of classes is more evidence of a plan's lack of good faith.

23. Lastly, the Third Plan states that the administrative claims will be paid "first from funds otherwise payable to Class 2." While it may be a typo, it appears that the Debtor is either paying administrative claimants FROM the funds outlaid for unsecured claimants or, even stranger, paying administrative claimants from funds that were supposedly paying the Navy Federal Credit Union claim pursuant to its contract. If it is the latter, this would cause immediate default and prove the Third Plan as not confirmable, because it would be followed by an immediate liquidation. It is if the former, it is evidence that the Third Plan has no intention of paying unsecured creditors, despite not requiring payments for one year, utilizing a below market interest rate, and a favorable property valuation.

Interest Rate

24. The Third Plan purports to pay Creditor interest at a rate of 3.375%. Creditor objects to the interest rate and the same is not confirmable. This interest rate does not include a proper risk-adjusted premium pursuant to the holding in *Till v. SCS Credit Corp.*, 541 U.S. 465, 1224 S.Ct. 1951 (2004). The Plan proposed interest rate of 3.375% in inadequate and inequitable, "Because bankrupt debtors typically pose a greater risk of nonpayment than solvent commercial borrowers, the approach then requires a bankruptcy court to adjust the prime rate accordingly. The appropriate size of that risk adjustment depends, of course, on such factors as the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan." *Id.* The current prime rate is 7.50%. The prime rate plus a risk adjustment premium of approximately 3.0% would be more appropriate. The Debtor meets several factors for the addition of a risk adjusted premium:

    a.    The debtor is currently involved in a bankruptcy proceeding with payments in a Chapter 11 plan that extend over a prolonged period of time (10 plus years). The debtor's default on the obligations of the Note and Deed of Trust was an impetus for the current proceeding.

    b.    The property is claimed to not be homestead property and an upward risk adjustment should be added because there are substantial risks given that the Thid Plan's success depends greatly on securing paying tenants. The Debtor has shown an unwillingness to eject non-paying tenants, which further supports an upward adjustment of the risk premium.

    c.    Debtor has a history of default related to the Property as evidenced by the POC.

  d. Even if the Debtors' valuation and cram down of the property is successful, the loan to value ratio of the property would be 100%, which further supports an upward risk adjustment.

  e. Rental markets are inherently more volatile than residential markets.

  f. The income produced by the Debtor's realty business fluctuates greatly, increasing the risks associated with repayment.

  g. The Plan proposes making capital improvements to the Property BEFORE repayment to Creditor, further justifying an upward risk assessment given the Debtor's tenuous financial condition to perform under the grossly insufficient interest rate. Further, if the improvements are made, the Property may appreciate and the impact of the interest adjustment is mitigated.

<u>Feasibility</u>

25. Creditor objects in general to overall feasibility of the Third Plan. The Third Plan, by admission, is a statement of the Debtor's inability to pay even its modified claims. The Debtor's plan all but admits the sections of 11 U.S.C. §1112(b)(4) necessitating dismissal or conversion. There is a continuing loss to, or diminution of, the bankruptcy estate coupled with the absence of a reasonable likelihood of rehabilitation. The Debtor is accruing legal fees, Subchapter V Trustee fees, property taxes, and property insurance to name a few liabilities, without the inclusion of payments to Creditors. The most recent monthly operating report shows a loss of $1,467.26, despite making no payments to Creditor, not paying the rent in her current location, not paying the insurance or taxes related to the Property, nor making any of the proposed capital improvements to the Property during the administration of the case. It is highly unlikely with these set of facts that the Debtor can prove either that the debtor will be able to make all payments under the plan, or there is a reasonable likelihood that the debtor will be able to make all the payments, and the plan provides for appropriate remedies in the event of a default. *See* 11 U.S.C. §1191(c)(3).

26. The Debtor, in Section 6.01 of the Third Plan, is seeking to assume the unexpired leases of Luka Holdings LLC and Peter Fleck (together the "Tenants"). This assumption is further proof of the lack of feasibility of the Third Plan. The Debtor is seeking to keep the Tenants in the Property despite their lack of payment prior to the Petition Date and during the pendency of this case. Further, the Debtor testified that the Tenants were to perform capital improvements to the Property as an offset to owed rental payments. As of the date of this objection, it appears no

improvements have been made. The Debtor wishes to further saddle the Property with Tenants that cannot afford their rent or payment-in-kind arrangements while delaying payments to both Secured and Unsecured Creditors under the Third Plan. If the Debtor was serious about rehabilitating the Property, the eviction of non-paying tenants and the obtaining of new leases with financially stable tenants would be paramount. Even with new rental income, the Debtor's projections are mostly a hope and prayer. The assumption of the Tenant's lease calls into question the good faith nature of the Debtor's entire reorganization.

27. Further, the Debtor proposes a below *Till* interest rate in repayment to the Creditor in the Third Plan, yet also delays beginning repayment to Creditor for a year after the Effective Date. This type of financial arrangement is not only dubious, but clearly shows that the reorganization is predicated on the Debtor not paying creditors under the Third Plan while still attempting to rehabilitate the assets of the estate. This is a plain admission of the Debtor that the Property is administratively burdensome and should be surrendered.

28. In the context of a Chapter 11, generally, under 11 U.S.C. §1129(a)(11), the Court is required to find that "confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor...." The widely accepted application of this section as stated within the Second Circuit decision of *Chase Manhattan Mortgage and Realty Trust v. Bergman (In re Bergman)*, 585 F.2d, 1171, 1179 (2nd Cir. 1978), wherein the Court stated: 'Under the test of feasibility, the court used the probability of actual performance of the provisions of the plan. Sincerity, honest, and willingness are not sufficient to make a plan feasible, and neither are visionary promises. The test is whether the things which are to be done after confirmation can be done as a practical matter under the facts.' In the context of a Subchapter V Chapter 11 Plan, this notion has been firmed up with express statutory requirements related to feasibility. Specifically, 11 U.S.C. § 1191(c) requires that the debtor will be able to make all payments under the Plan, or that there is a reasonable likelihood that debtor will be able to make all payments under the Plan. See, 11 U.S.C. § 1191(c)(3)(A)(i) and (A)(ii). Generally speaking, this requires the Debtor to be able to pay administrative claims on the Effective Date, and make the ongoing payments and expenses required under the Plan. Retaining property that is not producing net income, keeping tenants that do not pay rent, delaying payments to all creditors, all while reducing the value and interest rate of claims is

evidence of bad faith or lack of feasibility and such a plan should not be confirmed. *See In re Lindsey*, 122 B.R. 157 (Bankr. M.D. Fla. 1991) ("[T]he court may not and should not permit the debtors to use a [plan] to retain and increase their equity in investment property at the expense of their unsecured creditors."); see also *Loop Corp. v. United States Trustee*, 379 F.3d 511, 515-16 (8th Cir. 2004) (properties must generate positive cash flow to justify retention; negative cash flow alone is cause to dismiss or convert under § 1112(b)).

29.     The Monthly Operating Reports of the Debtor clearly demonstrate the inability of the Debtor to successfully collect rents (either from the Property or the office lease listed on the Petition). Without rental income, the Property will simply not be cash positive to support its debt obligation under the Third Plan, even after the delay for capital improvements and the below market interest rate. The Debtor's inability to collect rents from the Property or evict/eject non-paying tenants from the Property is evidence that the Debtor is not acting in good faith and employing commercially reasonable methods to repay both secured and unsecured creditors. If the Debtor is unable to collect rents from its current tenants, why should creditors believe that the Debtor will be successful with additional, new tenants?

30.     The success of the Third Plan requires optimistic projections of the Debtor, retention of funds without paying Creditors, below market and *Till* rates of interest, repayment over extended period of time, unexplained payments to an unsecured class of creditors, and new tenants to lease portions of the Property. All of these factors together, combined with the track record of the Debtor, show that the Third Plan is simply not feasible as proposed. The Third Plan will result in immediate default when payments due to the creditors actually begin and the Debtor will abscond with the equity to the determinant of creditors secured and unsecured.

## Conclusion

In conclusion, the Debtor cannot afford the plan of reorganization they propose. Even if the Creditor relented and allowed the Third Plan to move to confirmation, it would fail to meet the requirement of 11 U.S.C. §1129(A)(11), because the debtor would be forced to further reorganize or liquidate the Property.

WHEREFORE, with the above considered, Creditor respectfully requests that this Court:

A) SUSTAIN the Creditor's Objection to the Third Plan,

B) DENY Confirmation of the Debtor's Third Plan,

C) DISMISS the instant case because there is no need for further financial reorganization or the Plan is likely to be followed by a liquidation, or

D) CONVERT the case to a proceeding under Chapter 7 of the U.S. Bankruptcy Code; and

E) Such other and further relief as justice may require.

Dated: August 6, 2025            Respectfully submitted,

    /s/   Gregory C. Mullen
Gregory C. Mullen, Bar No. 29635
BWW Law Group, LLC
6003 Executive Blvd, Suite 101
Rockville, MD 20852
301-961-6555 (p), 301-961-6545 (f)
bankruptcy@bww-law.com

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 6th day of August, 2025, a copy of foregoing was served electronically via the CM/ECF system or by first-class mail, postage prepaid:

Maria Denise Reddick
3910 Georgia Ave NW
#619
Washington, DC 20011

Maurice Belmont VerStandig
9812 Falls Road
#114-160
Potomac, MD 20854

Kristen S. Eustis
Office of the United States Trustee
1725 Duke Street, Ste 650
Alexandria, VA 22314

Christianna Annette Cathcart
The Dakota Bankruptcy Firm
1630 First Ave N
Ste B PMB 24
Fargo, ND 58102-4246

Monique Desiree Almy
Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004

    /s/ Gregory Mullen
Gregory C. Mullen