IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re: | ) | Case No. 24-00393 |
| | ) | (Chapter 11) |
| MARIA D. REDDICK | ) | |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |

**MARIA D. REDDICK'S FOURTH AMENDED SUBCHAPTER V PLAN OF REORGANIZATION**

Comes now Maria D. Reddick ("Ms. Reddick" or the "Debtor"), by and through undersigned counsel, pursuant to the rigors of Official Form 425A and Section 1193 of Title 11 of the United States Code, and provides the following fourth amended plan of reorganization (the "Plan") herein:

**Background for Cases Filed Under Subchapter V**

a. **Description and History of the Debtor's Business**

Resilience often comes to light in the face of life's hardest trials, and a few embody this more fully than Ms. Reddick, whose determination spans multiple professional realms. She serves as a Program Specialist with the District of Columbia's Department of Building, holds broker licenses in D.C., Maryland, and Virgina, works seasonally with Delta Airlines when able, and has formed several single-member LLCs to manage her real estate ventures. Beyond her vocational roles, she has an unwavering commitment to both community and family.

Yet, even the most resourceful among us can find themselves navigating financial headwinds. In Ms. Reddick's case, her current financial reorganization is a deliberate effort aimed at recalibration. At the heart of this case lies her investment property – what she has long regarded as her "true home." This property represents more than bricks and mortar; it symbolizes the vision and initiative that underlie her entrepreneurial endeavors. When mortgage payments fell behind, exacerbated by a tenant struggling with rent and an unoccupied suite, she chose empathy over eviction, a response that mirrors her broader ethos in both business and personal matters.

Ms. Reddick now seeks to formally reorganize through the provisions of this Plan. As an intelligent and accomplished professional, Ms. Reddick has long exemplified a commitment to excellence across multiple roles. She is precisely the kind of debtor envisioned by Subchapter V of Chapter 11 of Title 11 of the United States Code—someone who, though facing temporary financial obstacles, has a clear path to restructuring and future financial success.

This case was thusly filed on November 21, 2024, with the open and transparent aim of using tools uniquely available under Title 11 of the United States Code (the "Bankruptcy Code") to preserve her "true home" through planned renovations, reoccupying the vacant suite, and restructuring her mortgage obligations. Equally, Ms. Reddick intends to secure sufficient income for a fair distribution to creditors under this Plan. Guided by resourcefulness, empathy, and a steadfast dedication to her obligations, Ms. Reddick's primary objective is not merely to prevent

1

foreclosure but to safeguard the foundation she has built for her future and the well-being of those who rely on her.

### b. Liquidation Analysis & Secured Claim Valuation

To confirm the Plan, the Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such claim and equity interest holders would receive in a Chapter 7 liquidation. The Debtor initially entered bankruptcy with assets totaling $1,034,864.67. From that figure, $610,000.00 represent secured claims, $166,320.00 reflects non-debtor equity, and $21,986.99 comprises exemptions. In a purely mechanical calculation, those deductions would leave $196,557.68 in nonexempt property for liquidation. Subtracting $13,077.88 in estimated Chapter 7 administrative expenses from that nonexempt amount suggests $183,479.80 would be available to pay general unsecured creditors. Compared to the total unsecured debt of $380,957.96, this simplistic approach points to a dividend of roughly 48.16% under a hypothetical Chapter 7.

The Debtor contends, however, that a Chapter 7 liquidation would produce significantly less than this "arithmetic" calculation implies. After carefully evaluating each asset's realistic liquidation potential and administrative costs, the Debtor proposes the following adjustments: (i) retaining the Navy Federal Credit Union balance of $18,208.18 at full value; (ii) treating the tax refund of $17,011.00 and $8,161.00 as fully collectible; (iii) discounting the $14,000.00 interest in BeBe Realty Sales and Consulting by 90% to $1,400.00 given that its value depends heavily on the Debtor's personal expertise; (iv) discounting the $2,975.00 interest in Luka Holdings by 90% to $297.50, for the same reason; (v) discounting $112,825.50 in unpaid rent by 90% to $11,282.50, to reflect the practical barriers in collecting from tenants; and (vi) discounting the $22,680.00 interest in an unprobated estate by 75%, leaving a value of $5,670.00. After factoring in $6,351.51 for Chapter 7 administrative expenses, the Debtor calculates that the actual nonexempt property would be $55,678.67, resulting in a scant 14.62% return to general unsecured creditors.

Meanwhile, the Debtor's Plan proposes a more structured approach to asset management and debt repayment. Notably, the Plan acknowledges the fully secured $610,000.00 claim and provides for its repayment under restructured terms. For general unsecured creditors, the Debtor proposes $100,185.00 in total distributions over five years – an amount that is likely to exceed what would be realized in a Chapter 7 "fire sale." By avoiding rushed asset liquidation and preserving the Debtor's ability to collect on receivables and business interests, the Plan is designed to maximize overall creditor recovery. Creditors will therefore receive at least as much under this methodical Chapter 11 approach as they would be in a Chapter 7 liquidation, and more likely, since the Plan endeavors to protect and enhance the values that would be lost or heavily discounted in a forced liquidation scenario.

### c. Ability to Make Future Plan Payments and Operate Without Further Reorganization

The Debtor must also demonstrate that she will have sufficient cash flow over the life of this Plan to make all required payments and to continue operations without the need for further reorganization. Forward-looking financial projections ("Financial Projections") for the Debtor are attached hereto as Exhibit A and are incorporated herein by reference. These projections show that the Debtor will generate adequate disposable income (as defined in § 1191(d) of the Bankruptcy Code) to fund all distributions required under this Plan.

Notwithstanding the Debtor's confidence in these projections, real estate and related

2

ventures may be subject to external economic pressures such as fluctuating property values, changes in tenant demand, and unforeseen repair or renovation costs. While the Debtor has used the best available data to forecast post-renovation occupancy and anticipated rents, she acknowledges that no projection is a guarantee of future performance. If material setbacks arise – such as unexpected vacancies, an unanticipated increase in costs, or substantial changes in market conditions – the Debtor will endeavor to mitigate these risks promptly, including pursuing modifications within the bounds of the Bankruptcy Code and any applicable Plan provisions.

Despite such uncertainties, the Debtor believes that her realistic revenue assumptions, combined with prudent cost management and a clear plan for rent collection, will yield sufficient disposable income to cover all projected Plan distributions. The Debtor has established contingency measures, such as maintaining a reserve for unexpected expenses and setting flexible lease terms, to further ensure ongoing feasibility. In the Debtor's view, these strategies best position both the Debtor and creditors to benefit from a successful reorganization and reduce the likelihood of any subsequent bankruptcy filing. Accordingly, the Debtor believes that this Plan is feasible within the meaning of Section 1191(c)(3) of the Bankruptcy Code and that it provides a reasonable likelihood of successful completion without the need for further reorganization.

**You should consult with your accountant or other financial advisor if you have any questions pertaining to these projections.**

**Article 1.** **Summary**

This Plan under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") proposes to pay creditors of the Debtor from the general cash flow of the Debtor.

The Plan provides for: Two (2) classes of secured claims; and

One (1) class of non-priority, unsecured claims.

The Plan also provides for the payment of administrative priority claims other than those placed in classes.

**Your rights may be affected. You should read these papers carefully and discuss them with your attorney, if you have one. (If you do not have an attorney, you may wish to consult one.)**

**Article 2.** **Classification of Claims and Interests**

| | | |
|---|---|---|
| **Section 2.01** | **Class 1** | The secured claim of PHH Mortgage Service. The unsecured portion of this creditor's claim is placed in Class 3, and this creditor is thusly regarded as holding two claims. |
| **Section 2.02** | **Class 2** | The secured claims of Navy Federal Credit Union. |
| **Section 2.03** | **Class 3** | All general unsecured claims. |

3

**Article 3.    Treatment of Administrative Expense Claims and Court Costs**

**Section 3.01    Unclassified Claims**    Under § 1123(a)(1) of the Bankruptcy Code, certain administrative expense claims are not in classes.

**Section 3.02    Administrative Expense Claims**    All professionals including the Debtor's counsel and the Subchapter V Trustee will need to file applications with the Court to seek approval of their fee and expenses as allowed administrative expense claims within 30 days of the Effective Date. Any allowed administrative expense claim will be paid through the life of this Plan, per the allowances of Section 1191(e) of the Bankruptcy Code. Allowed administration claims will be paid first from funds otherwise payable to Class 3. To the extent that any secured creditor, including PHH Mortgage Service, advances funds post-petition for the payment of real estate taxes, insurance, or other necessary property-protection expenses, such advances shall constitute administrative expense claims under 11 U.S.C. § 503(b)(1) and shall be paid either through monthly payments under the applicable class treatment or upon completion of the Plan.

**Section 3.03    Priority Tax Claims**    Each holder of a priority tax claim will be paid in full no later than November 21, 2029. The Debtor expressly reserves the right to object to the allowance of any such claim, whether filed or amended. To the extent a priority tax claim is allowed, such claim shall be paid in full through the term of this Plan.

**Section 3.04    Statutory Fees**    There are no statutory fees due in this case.

**Section 3.05    Prospective Quarterly Fees**    There are no prospective quarterly fees that will be due in this case.

**Article 4.    Treatment of Claims and Interest Under the Plan**

**Class 1 – PHH Mortgage Service    Impaired**    Class 1 consists of the secured portion of the claim of PHH Mortgage Service, which is secured by a first-priority deed of trust on the real property located at 4012 14th Street NW, Washington DC, 20011 (the "Property"). This class is impaired, inasmuch as the Plan seeks to alter the terms upon which this debt shall be paid. The total amount of the secured claim is fixed at Six Hundred Ten Thousand Dollars ($610,000.00) representing the stipulated value of the Property as of the Effective Date of the Plan. The Debtor shall pay this obligation in accordance with modified terms, which provide for interest at a fixed annual rate of Three and Three-Eighths Percent (3.375%) per annum, calculated on a thirty (30)-

4

year amortization schedule. The Debtor shall make monthly payments of Two Thousand Six Hundred Ninety-Six Dollars and Seventy-Seven Cents ($2,696.77), commence November 1, 2025, and continue on the first day of each month thereafter for a period of one hundred twenty (120) months.

At the conclusion of the ten (10)-year term, the Debtor shall make a final balloon payment of all remaining unpaid principal and accrued interest, estimated at approximately Four Hundred Ninety-Nine Thousand Four Hundred Seventy-Seven Dollars and Forty-Eight Cents ($499,477.48). The Debtor shall satisfy this obligation through refinancing or such other commercially reasonable means as may be available, and shall provide the Secured Creditor with not less than ninety (90) days' written notice of the proposed method of payment. The projected amortization schedule ("Amortization Schedule"), attached hereto as Exhibit B, is incorporated herein by reference and reflects the monthly-payment structure and balloon repayment obligations. This structure is further detailed in Article 7 (Means for Implementation of the Plan).

The Debtor shall maintain current payments for all real estate taxes and hazard insurance associated with the Property. Any post-petition advances made by PHH Mortgage Service for the payment of taxes, insurance, or property protection shall be treated as administrative expenses in accordance with Article 3 (Administrative Expense Claims of this Plan).

Default and remedies applicable to this Class shall be governed by Section 8.05 (Default) of this Plan, which provides for written notice, a thirty (30)-day opportunity to cure, and termination of the automatic stay pursuant to 11 U.S.C. § 362 upon an uncured default. The lien of PHH Mortgage Service shall be retained until the allowed secured claim, together with all interest and approved administrative advances, has been paid in full. Any portion of the claim not secured by the value of the Property shall be treated as a general unsecured claim in Class 3. The amortization schedule begins in November 2024, aligned with the petition date, and reflects interest accruing during the initial twelve-month period in which no payments are due. Monthly payments begin on November 1, 2025, and this structure is included solely to illustrate the post-petition interest accrual and resulting principal balance at the time payments commence.

**Class 2 – Navy Federal Credit Union.** Class 2 consists of the secured claims of Navy Federal Credit Union ("Navy Federal"). This class is unimpaired, inasmuch as the Plan does not alter the contractual terms governing repayment of this obligation. This class shall be paid in accordance with the original terms of the applicable loan document, to the extent enforceable under non-bankruptcy law. The Debtor shall continue to make monthly payments directly to Navy Federal in the ordinary course, and this claim shall be deemed current as of the Effective Date of the Plan, unless otherwise agreed by the parties, or modified by order of the Court. The lien on the share account shall be retained until the secured claim is paid in full.

**Class 3 – General Unsecured Creditors. Impaired.** Class 3 consists of all allowed general unsecured claims. This class is impaired inasmuch as the Plan modifies the rights of such claims by providing for partial payment of their allowed amounts over time, rather than payment in full upon confirmation. After payment in full of all secured claims and administrative expenses, as provided in this Plan, Class 3 shall receive pro rata distributions from funds allocated by the Debtor over the life of the Plan, in an aggregate amount not less than One Hundred Thousand One Hundred Eighty-Five dollars and No Cents ($100,185.00). All allowed administrative expense

5

claims shall be paid first from funds otherwise available for distribution to this class, in accordance with Article 3 (Administrative Expense Claims) of this Plan. If, after such payments, no funds remain available for distribution, then no further payments shall be made to this class.

**Article 5.    Allowance and Disallowance of Claims**

**Section 5.01  Disputed Claim.** A *disputed claim* is a claim that has not been allowed or disallowed and as to which either: (i) a proof of claim has been filed or deemed filed, and the Debtor or another party in interest has filed an objection; or (ii) no proof of claim has been filed, and the Debtor has scheduled such claim as disputed, contingent, or unliquidated.

**Section 5.02  Delay of Distribution of Disputed Claims.** No distribution will be made on account of a disputed claim unless such claim is allowed by a final, non-appealable order.

**Section 5.03  Settlement of Disputed Claims.** The Debtor will have the power and authority to settle and compromise a disputed claim with court approval and compliance with Rule 9019 of the Federal Rules of Bankruptcy Procedure.

**Section 5.04  Time to Dispute Claims.** The Debtor does not presently anticipate objecting to any claims herein but reserves the right to do so. Any such claim objection must be filed by the Debtor within one hundred eighty (180) days from the Effective Date of this Plan (as defined in Section 8.02 herein), except any objection to the claim of any governmental tax creditor may be filed at any time within six months of the date on which such claim is filed.

**Section 5.05  Bifurcation of PHH Mortgage Service Claim.** For avoidance of doubt, Claim No. 12 held by PHH Mortgage Service, shall be deemed bifurcated pursuant to 11 U.S.C. §506(a) as follows: (i) a secured claim in the amount of $610,000.00, treated in Class 1 of this Plan; and (ii) an unsecured deficiency claims for any remaining balance, treated in Class 3. Such bifurcation and classification shall be binding upon confirmation of this Plan, unless otherwise ordered by the Court.

**Section 5.06  Effect of Classification.** The classification of claims and interests under Article 4 shall control the allowance and distribution of payments hereunder. Unless otherwise ordered by the Court, the treatment afforded to each class under Article 4 shall constitute a final determination of the nature and priority of each claim or interest for purposes of Plan implementation.

**Article 6.    Provisions for Executory Contracts and Unexpired Leases**

**Section 6.01  Assumption.** The Debtor assumes the executory contracts and unexpired leases with (i) Luka Holdings LLC/ Peter Fleck. The Debtor also assumes all executory contracts and unexpired leases for the provision of utility services to any building occupied by the Debtor and the provision of insurance to the Debtor.

**Section 6.02  Cure Payments.** Consistent with the provisions of Article 4 hereof, the Debtor will not make complete cure payments, to the counterparties of assumed contracts and unexpired leases, on the Effective Date. The Debtor will, rather, make such payments in equal installments over a period of one year, commencing on the first business day of the first month succeeding the Effective Date. For purposes of Section 365(b)(1)(A) of Title 11 of the United States Bankruptcy

Code (the "Bankruptcy Code"), the Debtor submits that the temporally prioritized payment of these arrearages under this Plan, coupled with the Debtor's healthy post-position financial performance and timely making of post-petition rent payments, constitutes "adequate assurance" of the cure payments being made. The Debtor equally submits that in the prism of this case, a one-year cure period is "prompt" in nature. Upon diligent inquiry, however, it does not appear any cure payments are due and owing.

**Section 6.03  Rejection.** The Debtor rejects all executory contracts and unexpired leases not assumed in Section 6.01 hereof.

**Article 7.    Means for Implementation of the Plan**

The Debtor will continue to be employed as a Program Specialist with the District of Columbia's Department of Building, providing a stable and consistent base income. In addition, the Debtor has begun earning income as a professional coach and through real-estate sales and consulting activities, both of which are expected to supplement her regular employment income and contribute materially to the funding of this Plan. The Debtor also intends to resume her seasonal employment with Delta Air Lines once medically cleared, thereby further enhancing available cash flow.

Because the Property is not the Debtor's principal residence, the Debtor proposes to restructure the secured claim of PHH Mortgage Service pursuant to Class 1 of this Plan. The obligation shall be repaid as a ten-year term, amortized over thirty (30) years, at a fixed annual interest rate of 3.375 percent. The Debtor shall make monthly payments of $2,696.77, commencing in Month 13 following the Effective Date (November 1, 2025), and continuing for one hundred twenty (120) months. The remaining balance, estimated at approximately $508,000.00, shall become due as a balloon payment on or before the tenth anniversary of the Effective Date. The Debtor reserves the right, upon maturity of the term, to satisfy the balloon payment using any commercially reasonable method she deems appropriate, including but not limited to refinancing or other strategic financial alternative. The Debtor shall begin pursuing refinancing no later than Year 9 of the Plan, providing PHH Mortgage Service not less than ninety (90) days' written notice prior to payoff. These repayment terms are fully set forth in Article 4 (Class 1 – PHH Mortgage Service) and summarized in the Amortization Schedule (Exhibit B) attached hereto.

Within the first three (3) months following the Effective Date, the Debtor shall deploy funds obtained from a wholly owned limited liability company, whether by loan or member distribution, to facilitate necessary renovations to the main floor of the Property. These renovations shall be performed by the current tenant occupying the basement suite, whose construction services will be credited toward curing rental arrears, thereby reducing overall project costs. The Debtor shall use commercially reasonable efforts to complete the renovations promptly so as to align with Plan confirmation and the commencement of rental revenue.

All net operating income derived from the Property, after deducting taxes, insurance, utilities, and other regular expenses, shall be applied toward Plan obligations. Should a shortfall arise in the early phases of performance, the Debtor may draw upon her salary, income from coaching or real-estate activities, or additional resources from the LLC to maintain timely payments under this Plan. The Debtor further reserves all rights to pursue back rent or damages from any tenant or

7

subtenant who has failed to meet their obligations, with any recoveries to be deposited into a segregated account and distributed in accordance with the classification and priority scheme set forth in this Plan.

The Financial Projections previously attached as Exhibit A and incorporated by reference in this Plan reflect the Debtor's ability to satisfy all obligations under this Plan through the combined strength of her regular employment income, coaching and real-estate revenue, and rental proceeds, thereby providing a practical and reliable means for the full and timely execution of the Plan.

**Article 8.    General Provisions**

**Section 8.01  Definitions and Rules of Construction.** The definitions and rules of construction set forth in Section 101 and 102 of the Bankruptcy Code shall apply when terms defined or construed in the Bankruptcy Code are used in this Plan.

**Section 8.02  Effective Date.** The effective date of this Plan shall be the first business day following the date that is fourteen (14) days after entry of the confirmation order. If a stay of the confirmation order is in effect on that date, the effective date shall be the first business day after the stay expires or is otherwise terminated. All payments and obligations required to be made under this Plan shall commence or become effective on or after the effective date, except as otherwise specifically provided herein.

**Section 8.03  Severability.** If any provision in this Plan is determined to be unenforceable, such determination shall not limit or affect the enforceability and operative effect of any other provision of this Plan.

**Section 8.04  Binding Effect.** The rights and obligations of any entity named or referred to in this Plan shall be binding upon, and shall inure to the benefit of, the successors, assigns and/or receiver(s) of such entity.

**Section 8.05  Default.** Should there occur a default under this Plan, creditors shall have all rights provided under the Bankruptcy Code (including Section 1112 thereof, inclusive of its allowances for the bringing of a motion to convert this proceeding to one under Chapter 7 of the Bankruptcy Code) as well as the right to seek recourse for breach of contract together with such remedies as this Honorable Court may deem just and proper, sitting as a court of equity; such rights will also vest in any interested parties with Article III standing to pursue such rights. A default hereunder shall be deemed to occur if the Debtor fails to make any payment provided for by this Plan, in the full amount so provided, and does not cure such failure within thirty (30) days of being given written notice of said failure by a party in interest. If the Debtor fails to cure the default within that thirty-day period, the creditor may file with the Court a Notice of Termination of the Automatic Stay and serve a copy upon the Debtor and counsel. Unless the Debtor files an objection within fourteen (14) days after service of the notice, the automatic stay imposed by 11 U.S.C. § 362 shall be deemed terminated as to the notifying creditor without further order of the Court, and such creditor may thereupon pursue its rights and remedies under applicable law. If the Debtor timely objects, the stay shall remain in effect until the Court rules on the objection. A default shall likewise be deemed to occur if the Debtor materially breaches or violates and other substantive provision

8

of this Plan and fails to cure such breach within thirty (30) days after written notice thereof. Nothing herein shall limit the Debtor's right to seek appropriate relief from the Court upon good cause shown, nor shall it limit any creditor's right to seek other remedies provided by law or by this Plan.

**Section 8.06  Disbursing Agent.** Except as otherwise provided in this Plan, there shall be no disbursing agent hereunder, and the Debtor shall make all payments directly to creditors by check or, where available, direct deposit or auto- debit.

**Section 8.07  Captions.** The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

**Section 8.08  Controlling Effect.** Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure), the laws of the District of Columbia shall govern this Plan and any agreements, documents, or instruments executed in connection herewith, except as otherwise provided in this Plan and as may be necessary to implement its provision.

**Section 8.09  Escheat.** If any distribution remains unclaimed for a period of ninety (90) days after it has been delivered (or attempted to be delivered) in accordance with this Plan to the holder entitled thereto, such unclaimed property shall be forfeited by such holder. Unclaimed property shall be (i) first paid to other members of the same class until such class is paid in full; (ii) second paid to each junior class until all classes are paid in full; and (iii) then, if and when all classes are paid in full, any remaining funds may be donated in equal parts to the Howard University Law Clinic and Capital Temple Ministries, consistent with the missions of those organizations and subject to approval by the Court. The portion directed to the Howard University Law Clinic shall be administered in a charitable manner consistent with the Clinic's mission, with emphasis on supporting the Estate Planning and Heirs Property Clinic, the Fair Housing Clinic, and the Civil Rights Clinic.

**Section 8.10  Retention of Jurisdiction.** The United States Bankruptcy Court for the District of Columbia shall retain jurisdiction of this Chapter 11 case to issue orders necessary to the consummation of the Plan; to determine the allowance of compensation and expenses of professionals; to determine any and all adversary proceedings, applications and contested matters; to determine issues or disputes relating to the assumption of executory contracts and any claims related thereto; to determine disputes as to classification or allowance of claims or interests; to issue such orders in aid of execution of this Plan to the extent authorized by § 1142 of the Bankruptcy Code; to enforce the provisions of the Plan; to recover all assets of the Debtor and property of the Debtor's estate, wherever located; to resolve any dispute between or among any of the parties to this bankruptcy proceeding, to determine other such matters as may be set forth in a confirmation order or as may be authorized under the provisions of the Bankruptcy Code; to enter a final decree closing the bankruptcy case; and to correct any defect, cure any omission or reconcile any inconsistency in this Plan or confirmation order, and to take any action or make any ruling as may be necessary to carry out the purpose and intent of this Plan.

**Section 8.11  Modifications.** The Debtor may, with the approval of the Bankruptcy Court and without notice of holders of claims, correct any nonmaterial defect, omission, or inconsistency

9

herein in such a manner and to such extent as may be necessary or desirable. The Debtor may also amend this Plan in any manner that renders the terms hereof more favorable to creditors, with the approval of the Bankruptcy Court and without notice to holders of claims.

**Section 8.12  Professional Fees.** Per Section 3.02 of this Plan, the Debtor must seek the approval of this Honorable Court prior to paying any professional fees incurred during the pendency of this case. Commencing on the Effective Date, however, the Debtor shall be free to pay any post-confirmation fees incurred by the Subchapter V trustee, counsel, or other professionals, without first obtaining leave of court, and such professionals shall thereafter be excused from any requirement to seek leave of court.

**Article 9.    Discharge**

**Section 9.01  Discharge.** The Court shall grant the Debtor a discharge pursuant to 11 U.S.C. § 1192 of all debts that arose prior to the Petition Date in this case, except any debt (1) on which the last payment is due after the first five (5) years of the Plan; and (2) debts of the kind specified in Section 523(a) of the Bankruptcy Code.

(a) If the Plan is confirmed under 11 U.S.C. § 1191 as a consensual plan, the Debtor shall receive a discharge on the Effective Date of the Plan; or

(b) If the Plan is confirmed under 11 U.S.C. § 1191(b) as a non-consensual plan, the Bankruptcy Court shall grant a discharge upon the completion of all payments required under this Plan, including payment due to secured creditors whose obligations extend beyond the initial term of the Plan.

**Section 9.02  Effect of Discharge.** The discharge shall operate as an injunction under 11 U.S.C. § 524(a) against the commencement or continuation of any action, the employment of process, or any act to collect, recover, or offset any dischargeable debt as a personal liability of the Debtor. The discharge shall be effective as to all creditors and parties in interest that received notice of this bankruptcy case and sent a copy of this Plan, together with their respective members, managers, insiders, shareholders, officers, directors, trustees and receivers.

**Article 10.    Retention of Certain Assets; Notice of Substantial Consummation**

**Section 10.01** Pursuant to Section 1123(b)(3)(B) of the Bankruptcy Code, all litigation claims (including, but not limited to, rights arising under Chapter 5 of the Bankruptcy Code) shall remain an asset of the Debtor's bankruptcy estate—and shall, accordingly, remain subject to the protections of Section 362(c)(1) of the Bankruptcy Code, until the case is closed, dismissed, or converted, or until entry of the discharge, whichever occurs first, and which time any remaining interests shall revest in the Debtor.

**Section 10.02** If the Plan is confirmed under 11 U.S.C. § 1191(a), the Debtor shall file a Notice of Substantial Consummation not later than fourteen (14) days after the Plan is substantially consummated per 11 U.S.C. § 1183(c)(2). The Plan shall be deemed substantially consummated upon commencement of Plan payments and satisfaction of all condition's precedent to its effectiveness.

10

*Margin comments (Deleted):*
- Section Break (Next Page)
- ),
- the plan
- being made in June 2029
- This
- will
- against
- of the Debtor given
- —to and through December 7, 2029, at which time said interest (should any remain)…
- will
- ¶
- <object>

Respectfully Submitted,

/s/ Christianna A. Cathcart
Christianna A. Cathcart, Esq.
Bar No.: ND10008
THE BELMONT FIRM
1050 Connecticut Avenue NW
Suite 500
Washington, DC 20036
christianna@dcbankruptcy.com
*Counsel for the Debtor*

**Deleted:** ⋯⋯⋯⋯⋯Section Break (Next Page)⋯⋯⋯⋯⋯

11

**Deleted:** <*object*>

| Page 4: [1] Deleted | Author | 10/21/25 7:54:00 PM |
|---|---|---|
| Page 4: [2] Deleted | Author | 10/21/25 7:54:00 PM |