**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Greenbelt Division)**

| | |
|---|---|
| IN RE: | : |
| MARIA DENISE REDDICK | :  Case No. 24-00393-ELG |
| AKA MARIA "BEBE" REDDICK | : |
| DBA BEBE REALTY | : |
| Debtor. | :  Chapter 11, Subchapter V |

**OBJECTION TO MARIA D. REDDICKS FIFTH AMENDED SUBCHAPTER V**
**PLAN OF REORGANIZATION**

(Class 1 – Real Property: 4012 14th Street NW Washington DC 20011 – Claim 12)
(Class 3 – Unsecured Claim of approximately $270,619.40)

COMES NOW, Deutsche Bank National Trust Company, as Trustee for Saxon Asset Securities Trust 2007-4, Mortgage Loan Asset-Backed Certificates, Series 2007-4 c/o PHH Mortgage Corporation ("Creditor") and files this objection to Maria D. Reddick's Fifth Amended Subchapter V Plan of Reorganization (the "Fifth Plan") (ECF No. 112) filed on or about November 18, 2025, by Maria D. Reddick (the "Debtor") and respectfully objects as follows:

**BACKGROUND**

1. The Debtor filed for protection under Chapter 11 of the U.S. Bankruptcy Code on November 21, 2024 (the "Petition Date"). Among the assets of the Debtor is a parcel of real property, having an address of 4012 14th Street NW Washington, D.C. 20011 (the "Property"). The Property had acted as the principal residence of the Debtor at some point prior to the Petition Date. The address of the Debtor on Petition is a commercial rental property and the rent is disclosed in the monthly operating reports. It is unclear if the Debtor will reside in the Property post-confirmation. She refers to the Property as her "true home," (Fourth Plan, p. 1) despite not listing the Property as her principal residence in the Schedules. It is also unclear from the Plan if the Debtor is adding new value (as specified in 11 U.S.C. §1190).

2. The Debtor individually executed and delivered or is otherwise obligated with respect to that certain Adjustable Rate Note in the original principal amount of $508,500.00 (the "Note"). Creditor holds a lien on the Property by virtue of a recorded Deed of Trust (the "Deed of Trust"). The lien created by the Deed of Trust was perfected by recording of the Deed of Trust in the Recorder of Deeds for the District of Columbia on or about September 17, 2008. The Note and Deed of Trust were modified by a Home Affordable Modification Agreement, by and between

1

the Debtor and Creditor, effective July 1, 2015 (the "Loan Modification"). The Loan Modification had a total principal balance of $748,146.33, of which $233,246.33 was deferred until the maturity date of January 1, 2038. The interest bearing principal amount of $514,900.00 would be repaid in monthly installments at an interest rate of 3.375% in monthly installments. The loan was to remain escrowed for taxes and insurance. Some of the deferred principal balance was eligible for forgiveness if certain conditions were met.

3. On or about January 28, 2025, Creditor filed a Proof of Claim, Claim 12-1 (the "POC"), asserting a total secured claim against the Property of $880,619.40, with arrears due prior to the Petition Date of $272,357.26.

4. The Debtor filed a plan on February 19, 2025 (the "First Plan"). In the First Plan (as is the case with the Fifth Plan), the Debtor expressly recognized that Creditor had both a Secured and Unsecured Claim against the estate (*see* Fifth Plan, p. 4). Creditor objected to the First Plan and Creditor's treatment in that plan on April 11, 2025 (the "Original Objection") (ECF No. 65).

5. After the Original Objection was filed, the Debtor filed a Second Amended Subchapter V Plan of Reorganization (the "Second Plan") (ECF No. 85) on June 24, 2025. The day after the Second Amended plan was filed, on June 25, 2025, Maria D. Reddick's Third Amended Subchapter V Plan of Reorganization (the "Third Plan") (ECF No. 86) was filed. Creditor filed its objection to the Third Plan on August 6, 2025 (the "Second Objection") (ECF 93).

6. After attempts at consensual loss mitigation to resolve the default in the POC were unsuccessful, the Debtor filed Maria D. Reddick's Fourth Amended Subchapter V Plan of Reorganization (the "Fourth Plan") (ECF No. 103) on October 21, 2025. A hearing was held on confirmation of the Fourth Plan on October 24, 2025. At the hearing, it was determined that the Fourth Plan's change in treatment to unsecured creditors required soliciting ballots. A scheduling order was entered on the Fourth Plan on October 24, 2025 (ECF No. 107).

7. On or about November 14, 2025, Creditor filed a Motion for Relief from the Automatic Stay (the "Stay Relief Motion") (ECF No. 109).

8. On or about November 14, 2025, the Debtor filed a Notice of Fire Damage to real Property (the "Fire Notice") (ECF No. 111). The Fifth Plan elaborates that, "Subsequent to the filing of this case, but prior to confirmation of this Plan, a fire occurred in the basement area of

2

the Property, rendering the residential space temporarily unrentable while repairs are being undertaken." (Fifth Plan, p. 8).

9. On or about November 18, 2025, the Debtor filed the Fifth Plan.

10. The Fifth Plan treats Creditor's Secured Claim against the Property in Class 1. The treatment of Class 1 in the Fifth Plan is as follows:

> "Class 1 consists of the secured portion of the claim of PHH Mortgage Service, which is secured by a first-priority deed of trust on the real property located at 4012 14th Street NW, Washington DC, 20011 (the "Property"). This class is impaired, inasmuch as the Plan seeks to alter the terms upon which this debt shall be paid. The total amount of the secured claim is fixed at Six Hundred Ten Thousand Dollars ($610,000.00), representing the stipulated value of the Property as of the Effective Date of the Plan. The Debtor shall pay this obligation in accordance with modified terms, which provide for interest at a fixed annual rate of Three and Three-Eighths Percent (3.375%) per annum, calculated on a thirty (30)- year amortization schedule. The Debtor shall make monthly payments of Two Thousand Six Hundred Ninety-Six Dollars and Seventy-Seven Cents ($2,696.77), commencing on the Effective Date, and continuing on the first day of each month thereafter for a period of one hundred twenty (120) months.
>
> At the conclusion of the ten (10)-year term, the Debtor shall make a final balloon payment of all remaining unpaid principal and accrued interest, estimated at approximately Four Hundred Ninety-Six Thousand Eight Hundred Eighty-Nine Dollars and Eighty-Seven Cents ($496,889.87). The Debtor shall satisfy this obligation through refinancing or such other commercially reasonable means as may be available and shall provide the secured creditor with not less than ninety (90) days' written notice of the proposed method of payment. The projected amortization schedule ("Amortization Schedule"), attached hereto as Exhibit B, is incorporated herein by reference and reflects the monthly-payment structure and balloon repayment obligations. This structure is further detailed in Article 7 (Means for Implementation of the Plan).
>
> The Debtor shall maintain current payments for all real estate taxes and hazard insurance associated with the Property. Any post-petition advances made by PHH Mortgage Service for the payment of taxes, insurance, or property protection shall constitute administrative expense claims in accordance with Article 3 (Administrative Expense Claims of this Plan) of this Plan."

The Third Plan treats the Unsecured Claim of Creditor in Class 3. The treatment of Class 3 in the Third Plan is as follows:

> "This class consists of all allowed unsecured claims…After payment in full of all secured claims and administrative expenses as provided in this Plan, Class 3 shall receive pro rata distributions from funds allocated the Debtor over the life of the Plan, in an aggregate amount not less than One Hundred thousand One Hundred Eighty-Five dollars and No Cents ($100,185.00). All allowed administrative claims will be paid first out of funds otherwise designated for the payment of this class. If no funds remain after payment of the secured claim and administrative expenses, no distribution shall be made to this class."

11. Creditor has thus far abstained from taking the election under 11 U.S.C. §1111(b). Creditor objects to its treatment in Class 1 and in Class 3. As of the date of this objection, Creditor has submitted ballots REJECTING the Fifth Plan from both classes to counsel for the Debtor.

**ARGUMENT**

12. First, as the plan treatment is substantially similar in the Fifth Plan as in the Debtor's First Plan, Creditor incorporates by reference, and adopts fully, its Second Objection (ECF No 93) as if fully stated herein.

Administrative Claim Issues

13. Pursuant to the loan documents, the loan is currently escrowed for real estate taxes and insurance, and despite the Debtor's lack of payment, taxes and insurance continue to be advanced in regards to the Property.

14. Since the Petition Date, Creditor has advanced for real estate taxes and for insurance related to the Property. Creditor has thus far advanced:

   a. $343.25 monthly for hazard insurance related to the Property on December 4, 2024.
   b. $3,292.52 for hazard insurance related to the Property on December 31, 2024 (which resulted in a $67.75 refund in January 2025).
   c. $2,545.56 for hazard insurance related to the Property on January 21, 2025.
   d. $2,476.32 for hazard insurance related to the Property on February 20, 2025.
   e. $3,063.11 for real estate taxes related to the Property on March 12, 2025.
   f. $2,142.00 for hazard insurance related to the Property on May 21, 2025.
   g. $3,063.10 for real estate taxes related to the Property on September 2, 2025.

15. Creditor expressly reserves the right to amend or supplement this objection with the amount and dates of such other and further advances, in addition to the nearly $15,000 in advances made since the Petition Date described above.

16. Creditor is entitled to repayment for those post-petition advances for taxes and insurance that have been made on behalf of the Debtor for the benefit of the estate. Without such advancements, the Property could be lost to tax sale or sustain liability that would render any reorganization with the Property meaningless. Creditor reserves its rights to file a motion for the allowance and payment of any administrative claim prior to the established bar date for such claim set in this case.

17. The Fifth Plan states that the administrative claims will be paid "first from funds otherwise payable to Class 3." The Debtor is admitting that administrative claimants are being paid from the funds supposedly outlaid for unsecured claimants. The subsidizing of the

reorganization by the unsecured creditors is evidence of the plan's lack of feasibility. As the administrative claimants dip into the supposed "pot" of funds for unsecured claims, their pro rata share drops. As their pro rata share drops, the more likely these claimants, including Creditor, are better served by a Chapter 7 liquidation than the debtor's promises of future payment contained in the Fifth Plan. As the share of the pot for unsecured creditors shrinks, it is not clear when (or if) the administrative claimants will actually be paid, because the Fifth Plan is ambiguous, "such advances shall constitute administrative expense claims under Section 503(b)(1) of the Bankruptcy Code and shall be paid either through monthly payments under the applicable class treatment or upon completion of the Plan." (Fifth Plan, p. 4). The Fifth Plan is not only subsidizing the reorganization through the unsecured creditors, but also administrative claimants. By possibly delaying repayment of the expenditures and advances necessary to protect the Property until completion of the plan, Creditor (and possibly other claimants) are waiting up to ten (10) years to be repaid their advances. This is especially concerning given that the Debtor has needed to make a postpetition claim under the Creditor's insurance policy to deal with the damage contained in the Fire Notice.

### Interest Rate

18. The Fifth Plan purports to pay Creditor on its secured claim at annual interest at a rate of 3.375%. Creditor objects to the interest rate and the same is not confirmable. This interest rate does not include a proper risk-adjusted premium pursuant to the holding in *Till v. SCS Credit Corp.*, 541 U.S. 465, 1224 S.Ct. 1951 (2004). The Plan proposed interest rate of 3.375% in inadequate and inequitable, "Because bankrupt debtors typically pose a greater risk of nonpayment than solvent commercial borrowers, the approach then requires a bankruptcy court to adjust the prime rate accordingly. The appropriate size of that risk adjustment depends, of course, on such factors as the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan." *Id.* The current prime rate is 7.00%. The prime rate plus an upward risk adjustment premium of approximately 3.0% would be more appropriate.

19. While the Debtor may argue that the 3.375% rate is equitable because it is the current interest rate on the loan, that point is not persuasive. The current interest rate was determined by a consensual loan modification after an earlier default by the Debtor. The current interest is

5

secured by $506,596.58 in interest bearing principal balance and non-interest bearing principal balance of $155,497.55, not to mention the current $157,102.74 in interest due, $82,727.32 in escrow advances, $14,738.60 in other fees and costs associated with the loan. Reducing the amount in which Creditor is secured by nearly $300,000.00 and then arguing for a below market rate of interest, let alone an interest rate without a *Till* adjustment is further evidence of the Plan's infeasibility. The *Till* Court flatly rejected this 'presumptive contract rate' analysis because of the "absurd results" that occur. *Id.*, at 478.

20. The Debtor needs produce evidence that there is an efficient market for a 100% loan to value (assuming no degradation to value from the fire) loan, with a non-paying tenant (or only in-kind payment) residing in the Property, with a balloon payment after ten years of payment that supports an interest rate of 3.375%. If the Debtor cannot show this market exists, "But where no efficient market exists for [ ] Chapter 11 [debtor-in-possession financing], then the bankruptcy court should employ the formula approach endorsed by the Till plurality." *In re Walkabout Creek Ltd. Dividend Hous. Ass'n Ltd. P'ship*, 460 B.R. 567, 572 (Bankr. D.D.C. 2011) (quoting *Bank of Montreal v. Official Committee of Unsecured Creditors (In re American HomePatient, Inc.)*, 420 F.3d 559 (6th Cir.2005).

21. From the filings in this case, including the Fifth Plan, the Debtor meets several factors for the addition of a risk adjusted premium:

  a. The debtor is currently involved in a bankruptcy proceeding with payments in a Chapter 11 plan that extend over a prolonged period of time (10 plus years). The debtor's default on the obligations of the Note and Deed of Trust was an impetus for the current proceeding.

  b. The Fifth Plan contemplates a balloon payment of nearly half a million dollars ($496,889.87) at the end of the ten (10) year amortization payment without any assurances of how it can be paid or refinanced.

  c. The property is claimed to not be homestead property and an upward risk adjustment should be added because there are substantial risks given that the Fifth Plan's success depends greatly on not only making capital improvements to the Property, but securing paying tenants. The Debtor has shown an unwillingness to eject non-paying tenants, which further supports an upward adjustment of the risk premium.

  d. Debtor has a history of default related to the Property as evidenced by the POC.

  e. The Debtor is acting as the disbursing agent for the payments under the Plan (as opposed to a trustee). The ability of the debtor to direct payments to certain creditors over others is

6

      f.    Even if the Debtors' valuation and cram down of the property is successful, the loan to value ratio of the property would be 100%, which further supports an upward risk adjustment.

      g.    After the damage reported in the Fire Notice (which occurred in one of the rental spaces), it is likely that the Property has depreciated in value. Creditor may be under-secured from the outset of the Fifth Plan if the Property's value diminished from its undamaged $610,000.00 valuation.

      h.    Rental markets are inherently more volatile than residential markets. The Property is (between the fire damage and the Debtor's admissions regarding capital improvements) not in marketable condition to secure tenants currently. The current interest rate in the Fifth Plan fails to account for the actual market conditions surrounding the Property.

      i.    The income produced by the Debtor's realty business fluctuates greatly, increasing the risks associated with repayment.

      j.    The Plan proposes making capital improvements to the Property BEFORE repayment to Creditor, further justifying an upward risk assessment given the Debtor's tenuous financial condition to perform under the grossly insufficient interest rate. Further, if the improvements are made, the Property may appreciate and the impact of the interest adjustment is mitigated.

22.    The Debtor's inability to offer a market interest rate (or evidence of a market for the loan contemplated by the Fifth Plan), let alone an interest rate that attempts to meet the requirements of *Till* is evidence that the Plan is not fair and equitable and supports denial of confirmation.

Feasibility

23.    Creditor objects in general to overall feasibility of the Fifth Plan. The Fifth Plan, by admission, is a statement of the Debtor's inability to pay even its modified claims. The Fifth Plan is full of information implicating the sections of 11 U.S.C. §1112(b)(4) necessitating dismissal or conversion. There is a continuing loss to, or diminution of, the bankruptcy estate coupled with the absence of a reasonable likelihood of rehabilitation. The Debtor is accruing legal fees, Subchapter V Trustee fees, property taxes, and property insurance to name a few liabilities, without the inclusion of payments to Creditors. A Subchapter V Plan must meet all the provisions of 11 U.S.C. §1129(a)(except for subsection 15). "The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation." *Pookrum v. Bank of Am., N.A.*, 512 B.R. 781, 788 (D. Md. 2014) (quoting *Matter of Pizza of*

*Hawaii, Inc.*, 761 F.2d 1374, 1382 (9th Cir. 1985)). The Fifth Plan is exactly the type of visionary scheme that lacks the concrete feasibility requirements of Subchapter V.

24. Essentially, the Fifth Plan is asking unsecured creditors, the Class 2 Claimant, and administrative Claimants to all defer their payments while the Debtor pays only the secured portion of Creditor's claim at a 3.375% interest rate, amortized over thirty (30) years, but only for a term of ten (10) years, when at the end of that term, a balloon payment of nearly half a million dollars would still need to be addressed. All the while, the Debtor admits that she will be making capital improvements and/or renovations to the Property with funds that should be going to the unsecured creditors and administrative claimants. This admission is fatal to confirmation of the Fifth Plan. If the Debtor is diverting disposable income to capital improvements and rehabilitation of the Property, as opposed to paying claimants, the Debtor fails to "provide that all of the projected disposable income of the debtor to be received in the 3-year period, or such longer period not to exceed 5 years as the court may fix, beginning on the date that the first payment is due under the plan will be applied to make payments under the plan," 11 U.S.C. §1191(c)(2)(A). Confirmation of the Fifth Plan would allow the Debtor to divert disposable income from creditors to pay postpetition vendors for the repairs and renovations of the Property. This is not permitted in Subchapter V.

25. Further, the Debtor has failed to provide creditors with information regarding the planned renovations (the cost, the time to complete, the difference in rental rates, etc.). Failing to provide this information with the Financial Projections in fatal to confirmation of the Fifth Plan. In fact, the Fifth Plan estimates that $6,000.00 in monthly rental income will start in month 6 after confirmation. This is entirely fanciful, especially in light of the fire damage. If the Property can suddenly produce that level of income in month 6, while repairs are still ongoing or only recently finished, it stands to reason that the income should increase as the Property is more marketable. The Financial Projections do not include such an increase and do not explain why there will suddenly be rental income available to pay creditors under the Fifth Plan.

26. The Fifth Plan is replete with references to capital improvements/renovations that are to be made to the Property to make it marketable and to secure market rate tenants. The problem is that after confirmation, these capital improvements will come at the expense of all creditors without justification or repayment for the delay. Indeed, the debtor has only made one payment

to Creditor during the pendency of this case (now over 1 year). If capital improvements were to be made, that would have been the crucial time to make them. Instead, the Property was not only allowed to languish, interest and administrative claims to accumulate, but now, there is damage to the Property from the fire. Confirmation of the Fifth Plan would reward the Debtor for delaying in achieving their stated goals.

27.  The most recent monthly operating report shows a <u>loss of $1,042.39</u>, despite making no payments in the month to Creditor, not paying the rent in her current location, not paying the insurance or taxes related to the Property, nor making any of the proposed capital improvements to the Property. It is highly unlikely with these set of facts that the Debtor can prove either that the debtor will be able to make all payments under the plan, or there is a reasonable likelihood that the debtor will be able to make all the payments, and the plan provides for appropriate remedies in the event of a default. *See* 11 U.S.C. §1191(c)(3). The Fifth Plan is silent as to how the Debtor will finish repairs, complete renovations, pay contractors, and find new, market-rate tenants by month six (especially while retaining the non-paying tenants in the Property). Importantly, the Financial Projections attached to the Fifth Plan fail to include any expenses for the "planned renovations" to the Property. If there are costs not disclosed, the Debtor may have additional disposable income to devote to paying Creditors during the three to five year period under Subchapter V.

28.  The Fifth Plan delays payments to Class 2 for six (6) months after the effective date, delays repayment of administrative claims from the effective date to the vague timeframe of "through the life of this Plan," and then further delays payment to "completion of the Plan." The administrative insolvency of the estate is evidence of the lack of feasibility of the Fifth Plan.

29.  The Debtor, in Section 6.01 of the Fifth Plan, is seeking to assume the unexpired leases of Luka Holdings LLC and Peter Fleck (together the "Tenants"). This assumption is further proof of the lack of feasibility of the Fifth Plan. The Debtor is seeking to keep the Tenants in the Property despite their lack of payment prior to the Petition Date and during the pendency of this case. Further, the Debtor testified that the Tenants were to perform capital improvements to the Property as an offset to owed rental payments. As of the date of this objection, it appears no improvements have been made – in fact, the tenant's space is now damaged and will require

remediation. Far from adding new value, the Tenants have diminished the value of the estate by their lack of rental income, property damage, and failure to make the Property more marketable.

30. The Debtor wishes to further saddle the Property with Tenants that cannot afford their rent or payment-in-kind arrangements while delaying payments to both Secured and Unsecured Creditors under the Fifth Plan. If the Debtor was serious about rehabilitating the Property and getting it into marketable condition, the eviction of non-paying tenants and the obtaining of new leases with financially stable tenants would be paramount. Even with new rental income, the Debtor's projections are mere desires. The assumption of the Tenants' lease(s) calls into question the good faith nature of the Debtor's entire reorganization.

31. In the context of a Chapter 11, generally, under 11 U.S.C. §1129(a)(11), the Court is required to find that "confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor...." The widely accepted application of this section as stated within the Second Circuit decision of *Chase Manhattan Mortgage and Realty Trust v. Bergman (In re Bergman)*, 585 F.2d, 1171, 1179 (2nd Cir. 1978), wherein the Court stated: 'Under the test of feasibility, the court used the probability of actual performance of the provisions of the plan. Sincerity, honest, and willingness are not sufficient to make a plan feasible, and neither are visionary promises. The test is whether the things which are to be done after confirmation can be done as a practical matter under the facts.' In the context of a Subchapter V Chapter 11 Plan, this notion has been firmed up with express statutory requirements related to feasibility. Specifically, 11 U.S.C. § 1191(c) requires that the debtor will be able to make all payments under the Plan, or that there is a reasonable likelihood that debtor will be able to make all payments under the Plan. See, 11 U.S.C. § 1191(c)(3)(A)(i) and (A)(ii). Generally speaking, this requires the Debtor to be able to pay administrative claims on the Effective Date, and make the ongoing payments and expenses required under the Plan. Retaining property that is not producing net income, keeping tenants that do not pay rent, delaying payments to all creditors, all while reducing the value and paying non-market interest rate on claims is evidence of bad faith or lack of feasibility and such a plan should not be confirmed. *See In re Lindsey*, 122 B.R. 157 (Bankr. M.D. Fla. 1991) ("[T]he court may not and should not permit the debtors to use a [plan] to retain and increase their equity in investment property at the expense of their unsecured creditors."); see also *Loop Corp. v. United States*

*Trustee*, 379 F.3d 511, 515-16 (8th Cir. 2004) (properties must generate positive cash flow to justify retention; negative cash flow alone is cause to dismiss or convert under § 1112(b)).

32. The Monthly Operating Reports of the Debtor clearly demonstrate the inability of the Debtor to successfully collect rents (either from the Property or the office lease listed on the Petition). Without rental income, the Property will simply not be cash positive to support even these highly debtor friendly debt obligations under the Fifth Plan. The Debtor's inability to collect rents from the Property or evict/eject non-paying tenants from the Property is evidence that the Debtor is not acting in good faith and employing commercially reasonable methods to repay both secured and unsecured creditors. If the Debtor is unable to collect rents from its current tenants, it is not fair or equitable to force creditors to accept the Debtor as a property manager to find and retain new tenants. While it may be admirable to choose empathy over eviction, retaining tenants that fail to pay rent hurts the Debtor's feasibility arguments.

33. Further, the Debtor proposes a below *Till* interest rate in repayment to the Creditor in the Plan. This type of financial arrangement is not only dubious, but clearly shows that the reorganization is predicated on the Debtor not paying creditors under the Plan while still attempting to rehabilitate the assets of the estate. This is a plain admission of the Debtor that the Property is administratively burdensome and should be surrendered.

34. The success of the Plan requires optimistic projections of the Debtor, retention of funds without paying Creditors, below market and *Till* rates of interest, repayment over extended period of time, unexplained payments to an unsecured class of creditors, and new tenants to lease portions of the Property. All of these factors together, combined with the track record of the Debtor, show that the Plan is simply not feasible as proposed. The Plan will result in immediate default when payments due to the creditors actually begin and the Debtor will abscond with the equity to the determinant of creditors secured and unsecured.

## Conclusion

In conclusion, the Debtor cannot afford the plan of reorganization they propose. If the Debtor can afford it, it is only because they have failed to disclose disposable income. The Fifth Plan is fair and equitable to Creditor. It requires delaying payment of necessary administrative claims, proposing non-market, non-*Till* interest rate, and giving the Debtor's fanciful projections more weight than the evidence of the Debtor's current and past management of the Property and

her affairs. The Debtor has failed to rehabilitate the Property during the pendency of the case. Now, they ask all of their creditors to subsidize their visionary scheme of a revitalized Property full of non-paying tenants and paying tenants. Even if the Creditor relented and allowed the Plan to move to confirmation, it would fail to meet the requirement of 11 U.S.C. §1129(A)(11), because the debtor would be forced to further reorganize or liquidate the Property when the market rate tenants fail to materialize in time with their projections.

    WHEREFORE, with the above considered, Creditor respectfully requests that this Court:

A) SUSTAIN the Creditor's Objection to the Fifth Plan,

B) DENY Confirmation of the Debtor's Fifth Plan,

C) DISMISS the instant case because of continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation, or

D) CONVERT the case to a proceeding under Chapter 7 of the U.S. Bankruptcy Code,

E) GRANT Creditor relief from the automatic stay; and for

F) Such other and further relief as justice may require.

Dated: <u>December 2, 2025</u>       Respectfully submitted,

                <u>/s/ Gregory C. Mullen</u>
                Gregory C. Mullen, Bar No. 29635
                BWW Law Group, LLC
                6003 Executive Blvd, Suite 101
                Rockville, MD 20852
                301-961-6555 (p), 301-961-6545 (f)
                bankruptcy@bww-law.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 2nd day of December, 2025, a copy of foregoing was served electronically via the CM/ECF system or by first-class mail, postage prepaid:

Maria Denise Reddick
3910 Georgia Ave NW
#619
Washington, DC 20011

Maurice Belmont VerStandig
9812 Falls Road
#114-160
Potomac, MD 20854

Kristen S. Eustis
Office of the United States Trustee
1725 Duke Street, Ste 650
Alexandria, VA 22314

Christianna Annette Cathcart
The Dakota Bankruptcy Firm
1630 First Ave N
Ste B PMB 24
Fargo, ND 58102-4246

Monique Desiree Almy
Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004

                                              ___*/s/ Gregory Mullen*_____
                                              Gregory C. Mullen