IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In re: ) | Case No. 24-00393 |
| ) | (Chapter 11) |
| MARIA D. REDDICK ) | |
| ) | |
| Debtor. ) | |
| ) | |

**MARIA D. REDDICK'S SIXTH
AMENDED SUBCHAPTER V PLAN OF REORGANIZATION**

Comes now Maria D. Reddick ("Ms. Reddick" or the "Debtor"), by and through undersigned counsel, pursuant to the rigors of Official Form 425A and Section 1193 of Title 11 of the United States Code, and provides the following sixth amended plan of reorganization (the "Plan") herein:

**Background for Cases Filed Under Subchapter V**

a. **Description and History of the Debtor's Business**

Ms. Reddick is a real estate professional with more than twenty-five years of experience in residential sales and property investment in the Washington, D.C. metropolitan area. She is licensed as a real estate broker in multiple jurisdictions, including the District of Columbia, and has historically conducted her activities through single-member limited liability companies, including BeBe Realty ("BeBe Realty"). In addition to brokerage and investment activities, Ms. Reddick has, at various times, earned wage and fee income from employment, consulting, and professional coaching services related to her real estate expertise.

Consistent with her professional background, Ms. Reddick acquired the real property located at 4012 14th Street, NW, Washington, D.C. 20011 (the "Property"), and converted it from a single-family residence into a two-unit residential building as a long term, income producing investment. Beginning with the 2007 housing downturn and continuing through the economic disruption associated with the COVID-19 pandemic, broader market conditions materially affected both sales activity and rental stability. Reduced transaction volume, increased tenant turnover, and periodic vacancies placed sustained pressure on cash flow associated with the Property and contributed to a gradual deterioration in the Debtor's ability to remain current on secured obligations.

The first-lien mortgage secured by the Property, currently held by Deutsche Bank National Trust Company, as trustee, and serviced by PHH Mortgage Corporation (collectively, "PHH"), became delinquent over time as a result of sustained cash flow pressures. Beginning in approximately 2016, the Debtor undertook repeated efforts to address the arrearage, including direct negotiations with the servicer, multiple loan modification requests, and applications for assistance under the Homeowner Assistance Fund program. Despite these good-faith efforts, no permanent resolution was achieved, and by late 2024 the Debtor remained in material default and faced imminent loss of the Property absent court-supervised restructuring. To preserve the Property and implement an orderly cure and restructuring of the mortgage indebtedness, the Debtor

1

filed a voluntary petition for relief under Subchapter V of Chapter 11 of Title 11 of the United States Code on November 21, 2024 (the "Petition Date").

Since the Petition Date, Ms. Reddick has continued to engage in income-producing activities through her real estate practice and related professional services. She has also taken steps to stabilize operations and preserve the value of the Property pending confirmation of this Plan. Through this Plan, the Debtor seeks to implement an orderly restructuring of the secured mortgage obligation, restore stabilized rental operations, and reorganize her financial affairs in a manner designed to maximize value for creditors.

### b. Description of the Property and Current Condition

The Property is an attached three-level rowhouse located in a predominantly residential neighborhood of Northwest Washington, D.C. The surrounding area consists primarily of similar attached residential structures and neighborhood retail establishments and is accessible to public transportation and major thoroughfares. Title to the Property is held by the Debtor in her individual name in fee simple.

The structure contains two separate dwelling units: an upper unit occupying the main and second floors and a basement accessory unit located on the lower level with independent living facilities. As described in the appraisal obtained by PHH and dated February 27, 2025 (the "Appraisal"), the Property is classified in "C5" condition, reflecting significant deferred maintenance and curable physical deficiencies. The Appraisal identifies outdated or non-functioning building systems, roof-related deficiencies, and interior components requiring repair and modernization to meet prevailing market standards.

Prior to the Petition Date, the Debtor began rehabilitating the upper unit to enhance and improve property marketability, while the basement accessory unit remained occupied by a long-term tenant. After the commencement of this case, a fire occurred affecting the lower-level unit, and the District of Columbia Department of Buildings determined that the structure was temporarily uninhabitable pending remediation. Rental operations were suspended as a result.

### c. Liquidation Analysis & Secured Claim Valuation

To confirm the Plan, the Court must determine that each holder of an impaired claim that does not accept the Plan will receive or retain, under the Plan and on account of such claim, property of value, as of the Effective Date, that is not less than the value such holder would receive in a hypothetical chapter 7 liquidation of the Debtor. See 11 U.S.C. § 1129(a)(7), as incorporated by 11 U.S.C. § 1191(b).

The Debtor's liquidation analysis, attached hereto as Exhibit A (the "Liquidation Analysis"), reflects total scheduled assets of $802,412.17. After applying category-specific liquidation discounts to account for forced-sale conditions, limited marketing time, and collection risk—particularly as to personal property and other non-cash assets—the estimated gross liquidation proceeds total $647,797.17 (the "Gross Liquidation Value").

In a chapter 7 liquidation, secured claims would be satisfied from the Gross Liquidation Value. The Liquidation Analysis assumes (i) an allowed secured claim in favor of PHH equal to the value of its collateral, $610,000.00, and (ii) an allowed secured claim in favor of Navy Federal Credit Union in the amount of $17,419.17. These secured claims total $627,419.17, leaving $20,378.00 in remaining proceeds before payment of chapter 7 administrative expenses.

2

Chapter 7 administrative expenses—including the trustee's commission under 11 U.S.C. § 326(a), professional fees, broker or auctioneer commissions, closing costs, and other wind-down and case administration expenses—are estimated at $52,500. This estimate exceeds the remaining liquidation proceeds available after satisfaction of secured claims and before consideration of the Debtor's exemptions under District of Columbia law, estimated at $19,688.07. After payment of secured claims, administrative expenses, and exemptions, no funds would remain available for distribution to holders of general unsecured claims, including the unsecured deficiency portion of PHH's claim. Accordingly, unsecured creditors would receive a zero percent recovery in a chapter 7 liquidation.

Under the Plan, by contrast, holders of allowed general unsecured claims are projected to receive aggregate distributions of approximately $96,521.07 over the five-year Plan term. Each holder of an impaired claim will therefore receive not less than it would receive in a chapter 7 liquidation.

    **d. Ability to Make Future Plan Payments and Operate Without Further Reorganization**

To confirm the Plan, the Court must also determine that confirmation is not likely to be followed by liquidation or the need for further financial reorganization and that the Debtor will be able to make all payments required under the Plan. See 11 U.S.C. § 1129(a)(11), as incorporated by 11 U.S.C. § 1191(c)(3). The Debtor's forward-looking financial projections, attached hereto as Exhibit B (the "Financial Projections"), provide a detailed analysis of projected disposable income (as defined in 11 U.S.C. § 1191(d)), after payment of administrative expenses, for the duration of the Plan. Under the assumptions stated therein, the projections reflect sufficient cash flow to fund all required Plan payments and to meet ordinary obligations as they become due.

During the initial phase of the Plan, while renovations and fire-related repairs to the Property are completed, the Debtor's projected cash flow is derived from regular net employment income, real estate commissions, and professional coaching revenue. Beginning in Month 7 following the Effective Date, after completion of the renovations and required inspections, contract rent of $5,170.00 per month is projected to commence under the approved District of Columbia Housing Authority ("DCHA") lease for the upper unit. Those payments are government administered and payable directly by DCHA, providing a stable baseline revenue stream during the remainder of the Plan term. Once the lower unit is restored to rentable condition, the Debtor anticipates additional market-rate rental income from that unit, further strengthening the Plan's margin for performance.

The Debtor intends to complete the repairs within the projected timeline and to maintain reasonable reserves for unexpected expenses, which mitigates risks associated with temporary vacancy, unanticipated repair costs, or similar contingencies. The Financial Projections are based on conservative assumptions regarding occupancy, rental income, and operating expenses, and they do not depend on speculative growth or contingent business opportunities. Based on these identified revenue sources and the Financial Projections, the Debtor has a reasonable likelihood of performing the Plan as proposed without the need for further financial reorganization.

**You should consult with your accountant or other financial advisor if you have any questions pertaining to these projections.**

**Article 1.     Summary**

3

This Plan under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") proposes to pay creditors of the Debtor from the general cash flow of the Debtor.

The Plan provides for:	Two classes of secured claims; and

One class of general unsecured claims.

The Plan also provides for the payment of administrative priority claims other than those placed in classes.

**Your rights may be affected. You should read these papers carefully and discuss them with your attorney, if you have one. (If you do not have an attorney, you may wish to consult one.)**

**Article 2.	Classification of Claims and Interests**

| Section 2.01 | Class 1 | The secured claim of PHH, as secured by the deed of trust encumbering the Property. To the extent PHH's claim exceeds the value of its collateral as determined pursuant to 11 U.S.C. § 506(a), such deficiency shall be classified and treated as a general unsecured claim in Class 3. |
|---|---|---|
| Section 2.02 | Class 2 | The secured claims of Navy Federal Credit Union. |
| Section 2.03 | Class 3 | All general unsecured claims that are not otherwise classified under this Plan, including any deficiency claims resulting from the bifurcation of secured claims pursuant to 11 U.S.C. § 506(a). |

**Article 3.	Treatment of Administrative Expense Claims and Court Costs**

| **Section 3.01** | **Unclassified Claims** | Under § 1123(a)(1) of the Bankruptcy Code, certain administrative expense claims are not in classes. |
|---|---|---|

4

| | | |
|---|---|---|
| **Section 3.02** | **Administrative Expense Claims** | Each holder of an administrative expense claim allowed under § 503 of the Bankruptcy Code (an "Administrative Expense Claim") shall be paid in full, either (i) on such other terms as may be agreed to in writing between the Debtor and the holder of such claim; or (ii) absent such agreement, in accordance with § 1191(e) of the Bankruptcy Code over the life of the Plan. As of the date of this Plan, the Debtor estimates that total unpaid Administrative Expense Claims, including professional fees and the compensation of the Subchapter V Trustee, will amount to approximately $80,000.00, subject to allowance by the Court.<br><br>All professionals seeking allowance of compensation and reimbursement of expenses shall file applications with the Court within thirty (30) days after the Effective Date. Any Administrative Expense Claim allowed by the Court shall be paid in accordance with § 1191(e) and shall be paid prior to any distributions to holders of general unsecured claims.<br><br>To the extent any secured creditor, including PHH Mortgage, advances funds post-petition for the payment of real estate taxes, insurance, or other necessary property-protection expenses relating to the Property, such advances shall be treated in accordance with the terms of the applicable loan documents and non-bankruptcy law, and shall not be deemed allowed Administrative Expense Claims unless otherwise ordered by the Court. |
| **Section 3.03** | **Priority Tax Claims** | Each holder of a claim entitled to priority under 11 U.S.C. § 507(a)(8) (a "Priority Tax Claim") shall be paid in full in cash in accordance with 11 U.S.C. § 1129(a)(9)(C), as incorporated by 11 U.S.C. § 1191(e). Such payments shall be made in regular installments over the term of the Plan, and in any event shall be completed not later than five (5) years after the Petition Date, unless otherwise agreed by the holder of such claim. The Debtor expressly reserves the right to object to the allowance, amount, or priority status of any asserted Priority Tax Claim, whether filed or amended. To the extent a Priority Tax Claim is allowed by the Court, it shall be paid in full in accordance with this Section. As of the date of this Plan, the Debtor is not aware of any outstanding Priority Tax Claims. |
| **Section 3.04** | **Statutory Fees** | There are no statutory fees due in this case. |
| **Section 3.05** | **Quarterly Fees** | There are no quarterly fees due in this case. |

5

**Article 4.    Treatment of Claims and Interest Under the Plan**

**Class 1 – PHH Mortgage Service._____Impaired.**

Class 1 consists of the secured claim held by PHH, arising under that certain Adjustable Rate Note dated August 13, 2007, as modified by the 2015 Loan Modification Agreement, and secured by a first-priority deed of trust encumbering the Property. PHH has filed Proof of Claim No. 12-1 asserting a total claim in the amount of $880,619.40 as of the Petition Date, inclusive of principal, deferred principal, accrued interest, escrow advances, fees, and prepetition arrears. This class is impaired, inasmuch, as the Plan modifies the amount of PHH's secured claim and the terms of repayment.

Pursuant to § 506(a) of the Bankruptcy Code and based on the value of the Property, PHH shall have an allowed secured claim in the amount of $610,000.00 (the "Class 1 Allowed Secured Claim"). The balance of PHH's claim, in the amount of $270,619.40, shall be treated as a general unsecured claim in Class 3.

In satisfaction of the Class 1 Allowed Secured Claim, the Debtor shall pay PHH the principal sum of $610,000.00, together with interest on the unpaid principal balance at a fixed rate of 7.50 percent per annum (prime plus 0.75 percent) as of the Effective Date), amortized over thirty years. Monthly principal and interest payments shall be made in the amounts and at the times set forth in the amortization schedule attached hereto as Exhibit C (the "Amortization Schedule"). Following completion of the sixty-month Plan term, the Debtor shall continue making the same monthly principal and interest payments, at the same fixed rate and on the same amortization basis, until the Class 1 Allowed Secured Claim is paid in full.

PHH shall retain its deed of trust and all valid liens securing the Class 1 Allowed Secured Claim until the Class 1 Allowed Secured Claim has been paid in full. Upon payment in full, PHH shall promptly release and reconvey its deed of trust and any related security instruments of record. PHH shall retain no lien securing any unsecured deficiency portion of its claim.

The Debtor may, at her option, prepay the Class 1 Allowed Secured Claim, in whole or in part, at any time, and any such prepayment shall be applied first to accrued but unpaid interest and then to principal. The Debtor may also refinance the Class 1 Allowed Secured Claim or sell the Property at any time, without further order of the Court, provided that PHH is paid, on or before the closing of such refinance or sale, the then outstanding principal balance of the Class 1 Allowed Secured Claim, together with all accrued but unpaid interest. Upon receipt of such payoff, PHH shall promptly release its deed of trust and any other liens securing the Class 1 Allowed Secured Claim.

The Debtor shall maintain current payments for all real estate taxes and hazard insurance associated with the Property. To the extent PHH makes any postpetition advances for taxes, insurance, or property protection that are permitted under applicable nonbankruptcy law, such advances shall be added to the Class 1 Allowed Secured Claim and shall be payable under the same terms and interest rate set forth herein.

On the Effective Date, the Note, deed of trust, adjustable-rate rider, loan modification agreement, and related loan documents shall be modified solely as expressly provided in this Class 1 treatment. Except as expressly modified herein, the remaining provisions of the loan documents shall remain in effect. To the extent any loan document conflicts with the Plan, the Plan controls.

The modified terms shall survive confirmation and shall govern the parties' rights and obligations unless the case is dismissed or converted prior to completion of Plan payments.

**Class 2 – Navy Federal Credit Union.          Impaired.**

Class 2 consists of the secured claims of Navy Federal Credit Union ("Navy Federal"), evidenced by Proofs of Claim Nos. 8-1, 9-1, and 10-1, in the aggregate amount of $17,419.14 as of the Petition Date (the "Class 2 Claim"). Each obligation is secured by a pledge of the Debtor's funds on deposit in the Debtor's share account(s) with Navy Federal (the "Pledged Share Account"). This Class is impaired, inasmuch, as the Plan modifies the repayment terms and provides for release of the Pledged Share Account as collateral.

On the Effective Date, subject to Navy Federal's written consent to the release, Navy Federal's lien and security interest in the Pledged Share Account, and any right of setoff against the Pledged Share Account arising from or relating to the Class 2 Claim, shall be released and terminated. The funds on deposit in the Pledged Share Account shall be released to the Debtor on the Effective Date and shall thereafter constitute property of the Debtor free and clear of any lien, security interest, or right of setoff held by Navy Federal arising from the Class 2 Claim. Navy Federal shall execute any documents reasonably necessary to evidence and effectuate the release.

In full and final satisfaction of the Class 2 Allowed Secured Claim, the Debtor shall pay Navy Federal as follows: (a) monthly interest-only payments of $32.66 for the first twelve months following the Effective Date; and (b) thereafter, equal monthly payments of principal and interest in the amount of $371.81, commencing in the thirteenth month following the Effective Date and continuing each month thereafter until the Class 2 Allowed Secured Claim is paid in full. Interest shall accrue at the applicable non-default contractual rate provided in the prepetition loan documents.

**Class 3 – General Unsecured Creditors.       Impaired.**

Class 3 consists of all allowed general unsecured claims not otherwise classified under this Plan, currently estimated in the aggregate amount of approximately $382,132.59. This class is impaired, inasmuch, as the Plan modifies the rights of holders of Class 3 claims by providing for partial payment of their allowed claims over the term of the Plan. Such claims include, without limitation: (i) the unsecured portion of the PHH Claim in the amount of $270,619.40; (ii) the unsecured claim of the U.S. Department of Education in the amount of $46,291.89; (iii) the claim of the U.S. Small Business Administration in the amount of $35,000.00; (iv) the claim of Navy Federal Credit Union in the amount of $9,726.10; and (v) other general unsecured claims, including the claims of Capital One in the amount of $5,543.73, American Express in the amount of $4,835.96, Congressional Federal Credit Union in the amount of $3,212.51, Washington Gas in the amount of $2,175.00, Credit One Bank in the amount of $3,813.00, Patient First in the amount of $858.00, and Baltimore Gas and Electric in the amount of $57.00.

Holders of allowed Class 3 claims shall receive distributions from the Debtor's available cash flow. Based upon the Financial Projections, the aggregate amount projected to be distributed to Class 3 is approximately $96,521.07, resulting in an estimated recovery of approximately 25.27% of allowed claims in this Class.

The Debtor anticipates making distributions to Class 3 creditors in the timing and amounts reflected in the Financial Projections, approximately as follows: $14,014.95 in Month 45;

$13,954.72 in Month 48; $15,757.07 in Month 51; $15,741.00 in Month 54; $18,511.72 in Month 57; and $18,541.61 in Month 60. Each distribution shall be made pro rata among holders of allowed Class 3 claims based upon the ratio that each holder's allowed claim bears to the total amount of allowed claims in this Class as of the applicable distribution date. The projected allocation of these distributions is reflected in the pro rata distribution schedule attached hereto as Exhibit D (the "Pro Rata Distribution Schedule").

All distributions to Class 3 shall be made solely from available cash flow after payment of ordinary operating expenses, required Plan payments to senior classes, allowed administrative expense claims, and amounts necessary to maintain reasonable working capital, consistent with the Debtor's Financial Projections. To the extent allowed, administrative expense claims exceed current projections—although the Debtor believes this scenario is unlikely—any funds otherwise available for distribution to Class 3 shall first be used to pay such allowed administrative expense claims in accordance with Article 3 of this Plan.

**Article 5.    Allowance and Disallowance of Claims**

**Section 5.01 Disputed Claim.** A *disputed claim* is a claim that has not been allowed or disallowed and as to which either: (i) a proof of claim has been filed or deemed filed, and the Debtor or another party in interest has filed an objection; or (ii) no proof of claim has been filed, and the Debtor has scheduled such claim as disputed, contingent, or unliquidated.

**Section 5.02 Delay of Distribution of Disputed Claims.** No distribution will be made on account of a disputed claim unless such claim is allowed by a final, non-appealable order.

**Section 5.03  Settlement of Disputed Claims.** The Debtor will have the power and authority to settle and compromise a disputed claim with court approval and compliance with Rule 9019 of the Federal Rules of Bankruptcy Procedure.

**Section 5.04 Time to Dispute Claims.** The Debtor does not presently anticipate objecting to any claims herein but reserves the right to do so. Any such claim objection must be filed by the Debtor within one hundred eighty (180) days from the Effective Date of this Plan (as defined in Section 8.02 herein), except any objection to the claim of any governmental tax creditor may be filed at any time within six months of the date on which such claim is filed.

**Section 5.05 Bifurcation of PHH Mortgage Service Claim.** For the avoidance of doubt, Claim No. 12 held by PHH Mortgage Service, shall be deemed bifurcated pursuant to 11 U.S.C. §506(a) as follows: (i) a secured claim in the amount of $610,000.00, treated in Class 1 of this Plan; and (ii) an unsecured deficiency claim for any remaining balance, treated in Class 3. Such bifurcation and classification shall be binding upon confirmation of this Plan, unless otherwise ordered by the Court.

**Section 5.06 Effect of Classification.** The classification of claims and interests under Article 4 shall control the allowance and distribution of payments hereunder. Unless otherwise ordered by the Court, the treatment afforded to each class under Article 4 shall constitute a final determination of the nature and priority of each claim or interest for purposes of Plan implementation.

**Article 6.    Provisions for Executory Contracts and Unexpired Leases**

**Section 6.01  Assumption.** The Debtor assumes the executory contracts and unexpired leases with (i) Luka Holdings LLC/ Peter Fleck. The Debtor also assumes all executory contracts and unexpired leases for the provision of utility services to any building occupied by the Debtor and the provision of insurance to the Debtor.

**Section 6.03  Rejection.** The Debtor rejects all executory contracts and unexpired leases not assumed in Section 6.01 hereof.

**Article 7.     Means for Implementation of the Plan**

The Debtor will implement and fund the Plan from identifiable, recurring income sources and the phased restoration and lease up of the Property, as reflected in the Financial Projections. Plan funding will be derived primarily from (i) the Debtor's net wage income from employment, (ii) rental income from the upper unit and basement unit of the Property as those units are restored to service, and (iii) income from the Debtor's professional real estate and related activities.

During the first six months of the Plan, the Debtor will focus on completing the fire-related repairs and interior renovations necessary to return the Property to full income-producing status. The renovation scope includes, among other items, second-floor bathroom work, a half bath addition, kitchen repairs or updates, and general improvements required to place the Property into code-compliant, rent-ready condition. The Debtor will fund renovation materials, fixtures, permitting, and other out-of-pocket costs from recurring non-rental income, as reflected in the Financial Projections.

The Debtor has an arrangement with the general contractor, who is also the basement tenant, pursuant to which the contractor is performing portions of the renovation work. The contractor is currently in arrears to the Debtor in the amount of $59,275.00, as reflected in the Debtor's business records. Renovation services are being performed in consideration of, and credited dollar-for-dollar against, the outstanding arrearage, based on the reasonable value of work completed, approved, and accepted by the Debtor. The Debtor will maintain contemporaneous documentation of all credits and corresponding work performed. Accordingly, labor costs reflected in the Financial Projections and related renovation estimates are expected to be reduced, in whole or in part, through this offset arrangement, mitigating the Debtor's out-of-pocket expenditures and preserving liquidity during the early months of Plan performance.

Beginning in or about Plan Month 7, upon completion of the interior renovations and required inspections, the Debtor will complete the lease-up process with the District of Columbia Housing Authority ("DCHA") so that contract rent for the upper unit at the approved rate of $5,170.00 per month commences and continues thereafter, subject to ordinary program compliance requirements. The Financial Projections assume this DCHA income stream for the balance of the Plan term. During this same period, the Debtor will address remaining repair and preservation items necessary for continued habitability and long-term operation of the Property, including repair of the rear deck and replacement of the HVAC system, whether through the tenant-contractor arrangement described above or through third-party contractors, as appropriate.

As to the basement unit, the Debtor has submitted an insurance claim under the applicable hazard policy and will use any insurance proceeds received to restore the basement unit and other affected building components to rentable condition. To the extent any insurance proceeds constitute cash collateral or are subject to a lien or security interest, the Debtor will use such

9

proceeds only with the consent of the affected lienholder or pursuant to Court order, and in either event primarily to restore, preserve, and protect the collateral and the related rental stream. Upon completion of repairs and re-occupancy, the basement unit will resume generating rental income in the amounts and timing reflected in the Financial Projections.

During Plan Months 1 through 6, while renovation and restoration work is ongoing and rental income is limited, the Debtor will make the payments required under Classes 1 and 2 and Article 3 as provided in the Plan. Thereafter, rental revenue from the Property, together with the Debtor's ongoing income, will fund Plan payments and distributions in accordance with the Financial Projections.

All projected disposable income for the sixty-month Plan term will be devoted to Plan payments in accordance. In the event of temporary delays in completing renovations, inspections, lease up, or receipt of insurance proceeds, the Debtor will continue to prioritize payments required under Classes 1 and 2 and Article 3 and may reduce, defer, or suspend distributions to Class 3 as necessary to avoid default, while maintaining compliance with the disposable income requirement.

**Article 8.    General Provisions**

**Section 8.01  Definitions and Rules of Construction.** The definitions and rules of construction set forth in Section 101 and 102 of the Bankruptcy Code shall apply when terms defined or construed in the Bankruptcy Code are used in this Plan.

**Section 8.02   Effective Date.** The effective date of this Plan shall be the first business day following the date that is fourteen (14) days after entry of the confirmation order. If a stay of the confirmation order is in effect on that date, the effective date shall be the first business day after the stay expires or is otherwise terminated. All payments and obligations required to be made under this Plan shall commence or become effective on or after the effective date, except as otherwise specifically provided herein.

**Section 8.03  Severability.** If any provision in this Plan is determined to be unenforceable, such determination shall not limit or affect the enforceability and operative effect of any other provision of this Plan.

**Section 8.04  Binding Effect.** The rights and obligations of any entity named or referred to in this Plan shall be binding upon, and shall inure to the benefit of, the successors, assigns and/or receiver(s) of such entity.

**Section 8.05  Default.** Should there occur a default under this Plan, creditors shall retain all rights provided under the Bankruptcy Code, including those set forth in Section 1112 (e.g., the right to bring a motion to convert the case to one under Chapter 7), as well as the right to seek recourse for breach of contract and such other remedies as the Court may deem just and proper in its equitable capacity. These rights shall also vest in any party in interest with standing under Article III of the United States Constitution. A default shall be deemed to occur if the Debtor fails to make any payments provided for under this Plan in the full amount required and does not cure such failure within thirty (30) days of written notice by a party in interest. If the Debtor fails to cure within that period, the affected creditor may file a Notice of Termination of the Automatic Stay with the Court and serve a copy on the Debtor and her counsel. Unless the Debtor files a written objection within

fourteen (14) days of service, the automatic stay under Section 362 of the Bankruptcy Code shall be deemed terminated as to the notifying creditor without further order of the Court, and that creditor may thereafter exercise its rights and remedies under applicable law. If the Debtor timely objects, the stay shall remain in effect pending the Court's resolution of the objection. A default shall also be deemed to occur if the Debtor materially breaches or violates any other substantive provision of this Plan and fails to cure such breach within thirty (30) days after written notice thereof. Nothing in this Section shall limit the Debtor's right to seek appropriate relief from the Court upon good cause shown, or shall it limit any creditor's right to pursue other remedies available by law or under this Plan.

**Section 8.06  Disbursing Agent.** Except as otherwise expressly provided herein, there shall be no separate disbursing agent hereunder, and the Debtor shall make all distributions directly to creditors by check or, where available, via direct deposit or automatic debit.

**Section 8.07  Captions.** The headings and section titles contained in this Plan are for reference and convenience only and shall not affect the meaning, interpretation, or construction of any provision herein.

**Section 8.08  Controlling Effect.** Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure), the laws of the District of Columbia shall govern this Plan and any agreements, instruments, or documents executed in connection with in, expect as otherwise provided herein or as necessary to implement its provisions.

**Section 8.09  Escheat.** If any distribution remains unclaimed for a period of ninety (90) days after it has been delivered (or attempted to be delivered) in accordance with this Plan to the holder entitled thereto, such unclaimed property shall be forfeited by such holder.  Unclaimed property shall be (i) first paid to other members of the same class until such class is paid in full; (ii) second paid to each junior class until all classes are paid in full; and (iii) then, if and when all classes are paid in full, any remaining funds may be donated in equal parts to the Howard University Law Clinic and Capital Temple Ministries, consistent with the missions of those organizations and subject to approval by the Court. The portion directed to the Howard University Law Clinic shall be administered in a charitable manner consistent with the Clinic's mission, with emphasis on supporting the Estate Planning and Heirs Property Clinic, the Fair Housing Clinic, and the Civil Rights Clinic.

**Section 8.10  Retention of Jurisdiction.** The United States Bankruptcy Court for the District of Columbia shall retain jurisdiction of this Chapter 11 case to issue orders necessary to the consummation of the Plan; to determine the allowance of compensation and expenses of professionals; to determine any and all adversary proceedings, applications and contested matters; to determine issues or disputes relating to the assumption of executory contracts and any claims related thereto; to determine disputes as to classification or allowance of claims or interests; to issue such orders in aid of execution of this Plan to the extent authorized by § 1142 of the Bankruptcy Code; to enforce the provisions of the Plan; to recover all assets of the Debtor and property of the Debtor's estate, wherever located; to resolve any dispute between or among any of the parties to this bankruptcy proceeding, to determine other such matters as may be set forth in a confirmation order or as may be authorized under the provisions of the Bankruptcy Code; to enter a final decree closing the bankruptcy case; and to correct any defect, cure any omission or reconcile

11

any inconsistency in this Plan or confirmation order, and to take any action or make any ruling as may be necessary to carry out the purpose and intent of this Plan.

**Section 8.11  Modifications.** The Debtor may, with approval of the Bankruptcy Court and without further notice to holders of claims or interests, correct any non-material defect, omission, or inconsistency of this Plan in such manner and to such extent as may be necessary or desirable. The Debtor may also amend this Plan in any manner that renders the terms hereof more favorable to creditors, with the approval of the Bankruptcy Court and without notice to holders of claims.

**Section 8.12   Professional Fees.** Pursuant to Section 3.02 of this Plan, the Debtor shall obtain Court approval prior to paying any professional fees incurred during the pendency of the case. Commencing on the Effective Date, however, the Debtor shall be free to pay any post-confirmation fees incurred by the Subchapter V Trustee, legal counsel, or other professionals without further Court approval, and such professionals shall thereafter be excused from any requirement to seek fee authorization from the Court.

**Article 9.       Discharge**

**Section 9.01   Discharge.** The Court shall grant the Debtor a discharge pursuant to 11 U.S.C. § 1192 of all debts that arose prior to the Petition Date in this case, except any debt (1) on which the last payment is due after the first five (5) years of the Plan; and (2) debts of the kind specified in Section 523(a) of the Bankruptcy Code.

(a) If the Plan is confirmed as a consensual plan under 11 U.S.C. § 1191, the Debtor shall receive a discharge on the Effective Date of the Plan; or

(b) If the Plan is confirmed as a non-consensual plan under 11 U.S.C. § 1191(b), the Bankruptcy Court shall grant a discharge upon the completion of all payments due within the term of this Plan, including payment due to secured creditors whose obligations extend beyond the initial term of the Plan.

**Section 9.02   Effect of Discharge.** The discharge shall operate as an injunction under 11 U.S.C. § 524(a) against the commencement or continuation of any action, the employment of process, or any act to collect, recover, or offset any dischargeable debt as a personal liability of the Debtor. The discharge shall be effective as to all creditors and parties in interest that received notice of this bankruptcy case and were sent a copy of this Plan, together with their respective members, managers, insiders, shareholders, officers, directors, trustees and receivers, to the extent they act or seek to act on account of any discharged debt.

**Article 10.      Retention of Certain Assets; Notice of Substantial Consummation**

**Section 10.01** Pursuant to Section 1123(b)(3)(B) of the Bankruptcy Code, all litigation claims (including, but not limited to, rights arising under Chapter 5 of the Bankruptcy Code) shall remain an asset of the Debtor's bankruptcy estate—and shall, accordingly, remain subject to the protections of Section 362(c)(1) of the Bankruptcy Code until the case is closed, dismissed, or converted, or until entry of the discharge, whichever occurs first, and which time any remaining interests shall revest in the Debtor.

**Section 10.02**  If the Plan is confirmed under 11 U.S.C. § 1191(a), the Debtor shall file a Notice of Substantial Consummation not later than fourteen (14) days after the Plan is substantially consummated per 11 U.S.C. § 1183(c)(2). The Plan shall be deemed substantially consummated upon commencement of Plan payments and satisfaction of all condition's precedent to its effectiveness.

                                                    Respectfully Submitted,

                                                    /s/ Christianna A. Cathcart
                                                    Christianna A. Cathcart, Esq.
                                                    Bar No.: ND10008
                                                  THE BELMONT FIRM
                                                  1050 Connecticut Avenue NW
                                                  Suite 500
                                                  Washington, DC 20036
                                                  christianna@dcbankruptcy.com
                                                  *Counsel for the Debtor*